# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **RENE POMALES, on behalf of himself and all others similarly situated,** | § § § | **Civil Action No. _____** |
| **Plaintiff,** | § § | (Removed from the Superior Court of Hampden County, Massachusetts, Cause No. 1979-CV-00939) |
| **v.** | § § § | |
| **AT&T MOBILITY SERVICES LLC,** | § § | |
| **Defendant.** | § | |

## <u>DECLARATION OF BRENDA ADAMS</u>

1.      "My name is Brenda Adams. I am over eighteen years of age, of sound mind, have never been convicted of a felony, and am competent in all respects to make this declaration.

2.      I am the Human Resources Business Partner for AT&T Mobility Services LLC ("AT&T" or the "Company"). The facts stated herein are within my personal knowledge, based on information obtained from other persons, reasonable inquiry, and company business records, and are all true and correct and, if called as a witness, I could and would competently testify thereto.

3.      On January 10, 2020, AT&T's Legal Department received a copy of Rene Pomales's Class Action Complaint, Tracking Order, and Summons in the lawsuit from Mr. Pomales's counsel via certified mail. AT&T Mobility Services LLC is a limited liability company. It is wholly owned by Cricket Holdco, Inc., a corporation organized in Delaware with a principal place of business in Atlanta, Georgia.

4.      Mr. Pomales worked for AT&T at a Company retail store in Holyoke, Massachusetts as a Retail Sales Consultant from October 12, 2018 until his resignation on July 1, 2019. During his employment Mr. Pomales was a member of a union and the terms of his employment were governed by a collective bargaining agreement ("CBA"). As unionized employees, all AT&T Retail Sales Consultants are subject to the provisions of the CBA.

Attached as **Exhibit 1** is a true and correct copy of the CBA governing Mr. Pomales's employment. It is an AT&T business record that has at all times been kept in the course of AT&T's regularly conducted business activity, and making this record is, and has been, a regular practice of that business activity.

5.    AT&T employed 492 commission-earning sales employees in Massachusetts in 2019. Most are members of a union and subject to the CBA. The average hourly rate of pay for this group of employees in 2019 was $19.06 an hour.   The total number of overtime hours (i.e. hours over 40 in each workweek) reported by these employees in 2019 was 25,119.65 hours.

6.    I declare under penalty of perjury that the foregoing is true and correct. Executed on February 10, 2020."

Brenda Adams

# EXHIBIT B-1

# 2017
## Regional
# Labor Agreement

## Communications Workers
## of America



## and
## AT&T Mobility Services LLC
## AT&T Customer Services, Inc.



Effective Date:    February 12. 2017
Expiration Date:   February 12, 2021

# LABOR AGREEMENT
## TABLE OF CONTENTS

| Article | Title | Page Number |
|---|---|---|
| 1 | Agreement | 1 |
| 2 | Recognition and Establishment of the Unit | 2 |
| 3 | Definitions of Employees | 4 |
| 4 | Agency Shop | 6 |
| 5 | Deduction of Union Dues | 6 |
| 6 | Management Rights | 6 |
| 7 | Grievance Procedure | 7 |
| 8 | Mediation | 10 |
| 9 | Arbitration | 12 |
| 10 | No Strike – No Lockout | 14 |
| 11 | Seniority | 14 |
| 12 | Hours of Work | 15 |
| 13 | Work Assignments | 17 |
| 14 | Force Adjustment | 18 |
| 15 | Non-Discrimination | 20 |
| 16 | Safety | 21 |
| 17 | Company-Union Relationship | 23 |
| 18 | Union Activities | 27 |
| 19 | Basis of Compensation | 28 |
| 20 | Travel | 32 |
| 21 | Absences | 33 |
| 22 | Vacations | 36 |
| 23 | Holidays | 39 |
| 24 | Excused Days with Pay | 41 |
| 25 | Exchange Time | 42 |
| 26 | Waiver of Further Bargaining | 43 |
| 27 | Duration of Agreement | 44 |
| Appendix A | Wages | 45 |

Memorandum of Agreement/Letters of Agreement

| | | |
|---|---|---|
| MOA 1 | CWA Internal Appeal Process | 52 |
| MOA 2 | Payroll Deduction of CWA-COPE | 53 |
| LOA 01 | Personnel Records Review | 55 |
| LOA 02 | Designated Union Representative | 56 |
| LOA 03 | Training Course Assignment | 57 |
| LOA 04 | Compensation Committee | 58 |
| LOA 05 | Subcontracting | 59 |
| LOA 06 | Four Day Tour | 60 |
| LOA 07 | Neutral Evaluations | 62 |
| LOA 08 | Work and Family Hardships | 63 |
| LOA 09 | Innovative Scheduling | 64 |
| LOA 10 | Motor Vehicle Usage Policy | 65 |
| LOA 11 | Sales  Quota Relief | 66 |
| LOA 12 | Quality Observations | 67 |
| LOA 13 | Prescription Safety Glasses | 69 |
| LOA 14 | Climbing Boots/Safety Footwear | 70 |
| LOA 15 | Strategic Alliance Committee | 71 |
| LOA 16 | "At Risk" Commissions | 73 |
| LOA 17 | Network Technicians | 74 |
| LOA 18 | Trial Retail Scheduling Tool | 75 |
| NTP | National Transfer Plan Letter of Agreement | 76 |

ARTICLE 1
AGREEMENT

THIS AGREEMENT is made and entered into effective **February 12, 2017** by and between AT&T Mobility **Services** LLC **and AT&T Customer Services, Inc**. as to those employees covered under Article 2 (hereinafter referred to as the "Company", the "Employer", or "Management") and COMMUNICATIONS WORKERS OF AMERICA (hereinafter referred to as the "Union").

ARTICLE 2
RECOGNITION AND ESTABLISHMENT OF THE UNIT

Section 1.  The Company recognizes the Union as the sole collective bargaining agent for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment for those covered employees in CWA Districts 1, 2-13, 4, 7, and 9 as defined **February 12, 2017**. The term covered employee and/or employees as used in this Agreement shall mean, those employees within the job titles set forth in Appendix A.  Outside Premise Sale Representatives and all employees exempt by the National Labor Relations Act are excluded.

Section 2.  For the purpose of determining whether employees employed in newly created job classifications or titles shall be included or excluded from the bargaining unit covered by the terms of this Agreement, the parties agree as follows:

a.  The Company shall have the right to create and define any new job classification or job title in the bargaining unit and to establish duties in connection with the creation of a job title/classification herewith as it shall deem appropriate.

(1) The Company shall notify the Union in writing of any newly created classifications or titles, the duties established therefore, and the temporary wage rate.

(2) Upon such notification the Company shall be free to staff such positions.

b.  The Union shall have the right, within thirty (30) calendar days of the date the Union was notified by the Company of the new classification or title, to initiate negotiations concerning the temporary wage rate established by the Company.  If negotiations are not so initiated within thirty (30) calendar days, the temporary wage rate will be made permanent.  If negotiations are so initiated within thirty (30) calendar days, they shall commence within thirty (30) days after the Union's request to initiate negotiations.  The parties agree that they shall negotiate for a period of no more than sixty (60) days from the date such negotiations commenced.

(1) If an agreement is reached by the parties within the said sixty (60) days as to the appropriate permanent wage rate, such agreement shall be applied retroactively to the day of the establishment of the new classification or title.

(2) If no agreement as to the appropriate permanent wage rate for such classifications or titles has been reached within the said sixty (60) days, the issue of the appropriate permanent wage

2

rate shall be subject to a binding mediation process.  A mediation conference shall be held as soon as possible but no later than thirty (30) days following conclusion of negotiations.

   (a)  If agreement is reached in the mediation process, as to the appropriate permanent wage rate, such agreement shall be applied retroactively to the day of establishment of the new classification or title.

   (b)  If no agreement is reached in the mediation process, each party shall submit a final proposed permanent wage rate to the mediator at the conclusion of the mediation conference.  The mediator shall determine which of the final submissions is appropriate, taking into account the facts, discussions and arguments presented by the parties during the conference.  The permanent wage rate designated by the mediator shall be applied retroactively to the day of the establishment of the new classification or title.

(3) The mediator used in the mediation process referred to in paragraph (2) above, shall be selected by mutual agreement of the parties within seven (7) days following the conclusion of negotiations.  If the parties are unable to agree on a mediator within this timeframe, they will select from a list of five (5) mediators compiled by the American Arbitration Association. Such individuals on the list shall possess acknowledged expertise in the area of job evaluation.

ARTICLE 3
DEFINITIONS OF EMPLOYEES

Section 1.   An "employee" is defined as any person designated as active on the payroll of the Company and covered by this Agreement as provided in Article 2 (Recognition).  Each employee will be classified as either regular or temporary as determined by the Company based on the employment period expectations at the time of hire.

Section 2.   A regular employee may be either full-time or part-time.

Section 3.   A regular full-time employee shall be deemed to be any employee regularly scheduled to work forty (40) hours per week and whose employment is reasonably expected to continue for longer than twelve (12) months.

Section 4.   A regular part-time employee shall be deemed to be any employee regularly scheduled to work less than forty (40) hours per week. The Company may reclassify part-time employees to full-time employees. Should the Company determine it appropriate to reclassify full-time employees to part-time employees; it will first seek volunteers from the affected work group and then force in reverse order seniority.   The classification of a part-time employee is based on the employee's "average equivalent work week".  The "average equivalent work week" of each part-time employee shall be reviewed by the Company no less often than every six (6) months of each year and adjusted on a prospective basis, if appropriate. In determining whether such adjustment is appropriate, the Company will consider the actual average number of hours worked per month during the preceding six (6) month period divided by 4.35, rounding the result to the next higher whole number.

Section 5.   A temporary employee is one who is engaged for a specific project or a limited period, with the definite understanding that his/her employment is to terminate upon completion of the project or at the end of the period, and whose employment is expected to continue for more than three (3) consecutive weeks, but not more than twelve (12) months, unless extended by mutual agreement.  However, if the project becomes indefinite, the Company may reclassify temporary employee(s) to regular full-time or regular part-time employees.

The termination of the employment of such temporary employees for reasons other than "work completed" shall be subject to the grievance provisions of this Agreement, however, such termination will not be subject to the arbitration provisions of this Agreement.

Section 6.   Temporary Agency workers shall not be deemed to be employees of the Company and, as such, shall not be covered by any of the terms or conditions of this Agreement.  The Company will provide a report to the Union, on a monthly basis, of the use of temporary agency workers.  The use of such temporary agency workers shall be kept to a minimum, generally not longer than ninety (90) days, but no more than one hundred eighty (180) days, unless mutually agreed to extend.

## ARTICLE 4
## AGENCY SHOP

Each employee, employed on or before the effective date of this Agreement and covered by the terms and conditions of this Agreement shall, as a condition of employment, either become a member of the Union, or pay or tender to the Union amounts which are the equivalent of periodic Union dues.

Employees employed or entering into the bargaining unit after the effective date of this Agreement shall, on or before the thirtieth (30th) day of their employment, and as a condition of such employment, either become a member of the Union or pay or tender to the Union amounts which are the equivalent of periodic Union dues.

The foregoing shall be subject to any prohibitions or restrictions contained in the applicable state laws.

## ARTICLE 5
## DEDUCTION OF UNION DUES

Section 1.  The Company agrees to make collections of Union dues, or agency fees each payroll period, through payroll deductions from the employee's pay, upon receipt of a written authorization form signed by the employee and delivered by the Union to the Company.  This authorization shall continue in effect until canceled by written notice from either the Secretary-Treasurer of the Union or the employee as set forth in the Payroll Deduction Authorization for Union Dues card.  The Company also agrees to electronically remit the amount so deducted to the designated representative of the Union on a monthly basis [by the tenth (10th) working day] and to furnish the Union a list of employees for whom such deductions have been made and the amount of each deduction.

Section 2.  The Company shall bear the full cost of dues deduction as set forth in Section 1. except that the Union agrees to print the dues deduction authorization cards in a form approved by the Company and the Union.

## ARTICLE 6
## MANAGEMENT RIGHTS

Subject to applicable law, all rights possessed by the Employer prior to the recognition of the Union, which rights are not governed by the terms of this Agreement, are reserved and retained by the Employer.

ARTICLE 7
GRIEVANCE PROCEDURE

Section 1.   All complaints and prospective grievances may be taken up informally by either the Company or the Union in advance of the formal grievance steps set forth below. Nothing in this Article shall be construed to deprive any employee or group of employees from presenting individually to the Company any complaint, and to have such complaints adjusted without the intervention of the Union, as long as the adjustment is not inconsistent with the terms of this Agreement, and provided further that a Union representative has been given opportunity to be present at such adjustment.

Section 2.   The Company and the Union agree that grievances shall be confined to differences arising out of the interpretation or application of the terms or provisions of this agreement, or disciplinary action for just cause and shall be processed according to the grievance procedure set forth in this Article.    It shall be the objective of both the Company and the Union to settle any grievance promptly and at the lowest step of the grievance procedure.

Grievances shall be reduced to writing, setting forth, if applicable, specifically the substance of the grievance and the provision or provisions of the Agreement allegedly violated, delivered by a Union representative to the designated Company representative in accordance with Section 3. following, within thirty (30) calendar days of the action complained of.

Section 3.   The formal grievance procedure shall consist of **two (2)** successive steps.   Notice of grievance and appeals of decision shall be forwarded in accordance with the following:

STEP 1

The designated **Company representative** shall contact the Union representative within seven (7) workdays of receipt of written notice of the grievance for the purpose of setting a mutually agreeable meeting date and location.   The designated **Company representative** will provide a decision in writing within ten (10) workdays after completion of the meeting(s) unless mutually agreed otherwise by the parties.

If the Company fails to offer a meeting date which is within fourteen (14) calendar days of receipt of the written notice of the grievance and no mutual agreement has been reached by the parties to extend the timeframe, the grievance may be advanced to the second step at the Union's option.

<u>STEP **2**</u>

If the answer or decision of the Company at the conclusion of the Step **1** is unsatisfactory to the Union, the grievance may be appealed to the designated Labor representative, in writing, within fifteen (15) workdays after a decision has been rendered at the **first** step.  The designated Labor representative shall contact the Union representative within seven (7) workdays of receipt of written notice of the grievance for the purpose of setting a mutually agreeable meeting date and location. Upon mutual agreement, the grievance may be conducted by telephone. The designated Labor representative will provide a decision in writing within fifteen (15) workdays after completion of the meeting(s), unless mutually agreed otherwise by the parties.

If the Company fails to offer a meeting date which is within fourteen (14) calendar days of receipt of the appeal to the **second** step of the grievance process and no mutual agreement has been reached by the parties to extend the timeframe, the grievance may be advanced to the arbitration process.  The option is only applicable to articles of the **2017** Labor Agreement or the provisions of such articles which are subject to the arbitration process as stated in the **2017** Labor Agreement.

Section 4.   A decision at Step **2** of the formal grievance procedure, as set forth in Section 2 above shall be construed as full completion of the formal grievance procedure.

Section 5.   After a notice, as set forth in Section 2 above, has been received by the Company neither the Company nor the Union will attempt to adjust the grievance with any employee or employees involved.  Any proposed adjustment will be presented by the Company to the designated Union representative.

Section 6.   The Company will keep the Union fully informed, in writing, on a current basis, of the designated Company representatives referenced in Sections 2. and 3. above.

Section 7.   Formal grievance meetings shall be held at mutually agreeable times and locations.  For the purpose of presenting a grievance, those employees of the Company including the aggrieved employee(s) and the employee representative(s) designated by the Union, who shall suffer no loss in pay for the time consumed in, and necessarily consumed in traveling to and from grievance meetings, shall not be more than two (2) at any level of the grievance procedure.

Section 8.   Failure to submit or pursue a grievance under the conditions and within the time and manner stated in Section 2 above shall be construed to be a waiver by the employee and the Union of the formal grievance.

Section 9.   Any provision in this Article to the contrary notwithstanding, no forms of discipline, including suspension and discharge, of employees with less than thirty (30) days of service with the Company shall be subject to the grievance procedure, provided, however, that the Company may extend said period for an additional thirty (30) days upon written request to the Union.

ARTICLE 8
MEDIATION

Section 1.  At the conclusion of the formal grievance procedure either party may elect to submit the matter to mediation, with the consent of the other party.  Such submission shall not extend the time periods permitted to process the grievance to arbitration.  The party desiring the matter be so submitted shall submit a written statement of appeal within two (2) weeks after receipt of the position statement rendered by the Company in the final step of the grievance procedure.

Section 2.  As to the mediation provided by this Article:

a.  The parties will select mediators by striking from a panel provided through the Federal Mediation and Conciliation Service or by using another mutually agreed upon service or procedure.  Upon agreement of the parties, the mediation conference will be scheduled within fifteen (15) days of the Company's or Union's request for mediation.  Such conference will be held on the earliest mutually available date offered by the chosen mediator.  Should the availability of the mediator unnecessarily delay the processing of the grievance in the opinion of either the Company or the Union, either party may request the mediation be terminated and the grievance be scheduled for arbitration.

b.  Any written material presented to the mediator shall be returned to the party presenting that material at the termination of the mediation conference.  The mediator may, however, retain one (1) copy of the written grievance, to be used solely for the purposes of statistical analysis.

c.  Proceedings before the mediator shall be informal in nature.  Each party shall have one principal spokesperson at the mediation conference.  The presentation of evidence is not limited to that presented in the grievance proceedings, the rules of evidence will not apply, and no records of the mediation conference shall be made.

d.  The mediator will have the authority to meet separately with any person or persons, but will not have the authority to compel the resolution of the grievance.

e.  If no settlement is reached during the mediation conference, the mediator shall provide the parties with an immediate oral advisory opinion, unless both parties direct that no opinion shall be provided, provided however, that said opinion, if issued, shall not be published or communicated to the public or to either parties' members or employees but shall be used internally by either party

solely for the purpose of analysis and assessment.  In no event shall such advisory opinion, if issued, be deemed binding on either party.

f.   If the mediator provides an opinion, he/she shall state the grounds on which it is based.

g.   The advisory opinion of the mediator, if accepted by both parties, shall not constitute a precedent, unless the parties otherwise agree.

h.   The mediator's fee and expenses will be divided equally between the parties.

Section 3.   If no settlement is reached at mediation, the parties are free to arbitrate under the Arbitration Article.

Section 4.   In the event that a grievance which has been mediated subsequently goes to arbitration no person serving as a mediator between these parties may serve as arbitrator.  Nothing said or done by the mediator may be referred to an arbitrator.  Nothing said or done by either party for the first time in the mediation conference may be used against it at the arbitration.

## ARTICLE 9
## ARBITRATION

Section 1.   It is agreed by both parties that arbitration shall be confined to matters processed through all steps of the formal grievance procedure, and in such event, the following procedures shall be exclusive.

Section 2.   If the answer or decision of the Company's representative at the conclusion of Step **2** of the formal grievance procedure, as described in Article 7, is unsatisfactory to the Union, the Union shall, in writing, to the designated Company representative, within sixty (60) calendar days thereafter, request arbitration, if such is desired.

Section 3.   A panel of at least eight (8) but no more than ten (10) qualified arbitrators per district will be selected by the parties.  To select this panel, each party shall initially be entitled to recommend up to five (5) arbitrators subject to objection by the other party.  The arbitrators on this panel must be a member of the American Arbitration Association (AAA) and act in accordance with the AAA rules.  Each arbitrator will serve until the termination of this Agreement unless his/her services are terminated earlier by written notice from either party to the other.  The arbitrator will be notified of his/her termination by a joint letter from the parties.  The arbitrator will conclude his/her services by settling any grievance previously heard.  A successor arbitrator will be mutually selected by the parties from the AAA membership. Arbitrators will be assigned cases in rotating order designated by the parties.

The compensation and expenses of the arbitrator and the general expenses of the arbitration will be borne by the Company and the Union in equal parts.  Each party will bear the expense of its representatives and witnesses.   Any expenses incurred because of any cancellation or postponement of a hearing will be borne by the party requesting such cancellation or postponement.

Section 4.   The arbitrator shall be confined to the subjects submitted for decision, and may in no event, as a part of any such decision, impose upon either party any obligation to arbitrate on any subjects which have not been herein agreed upon as subjects for arbitration.  The arbitrator shall not have jurisdiction over the rights of Management not specifically restricted by this Agreement and shall not have the power to add to, subtract from, or vary the terms of this Agreement, or to substitute his/her discretion for that of Management, but shall be limited in power and jurisdiction to determine whether there has been a violation of this Agreement. The arbitrator's decision shall be final and binding upon both parties and any employees affected.

Section 5.   Except where otherwise mutually agreed, failure to submit a matter to arbitration within the times above stated or failure to pursue subsequent steps within the time and in the manner above stated shall constitute a waiver by the employee and the Union of the right to arbitration.

Section 6.   Upon the Union's providing the Company with a reasonable period of advance notice, the Company shall allow reasonable time off without pay for Grievant and/or Union witnesses to prepare for arbitration.   For the purpose of presenting an arbitration, the Grievant and one Union representative need not clock out if the proceeding occurs during Grievant's and representative's regularly scheduled working hours, but other Union representatives who are employees of the Company and all other employees participating in the arbitration proceeding shall clock out for that purpose.

Section 7.   Any provision in this Article to the contrary notwithstanding, no form of discipline, including suspension and discharge, of employees with less than twelve (12) months of service shall be subject to arbitration.

## ARTICLE 10
## NO STRIKE - NO LOCKOUT

Section 1.   During the life of this Agreement, the Union and the employees covered under this Agreement, shall not cause, call, or sanction strikes of any kind, including sympathy strikes and strikes in protest of alleged unfair labor practices, boycotts, work stoppages or slowdowns which interfere with the Company's production or business.

Section 2.   In the event any violation of the previous Section occurs, which is unauthorized by the Union, the Company agrees that there shall be no financial liability on the part of the Union or any of its officers or agents, provided that in the event of such unauthorized action the Union promptly advises the members of the Bargaining Unit that such action is unauthorized and that the involved members should return to work or cease such action.

The Company and the Union will work together to bring any such unauthorized action to an end.

Section 3.   The Company agrees that there will be no lockouts during the duration of this Agreement.

## ARTICLE 11
## SENIORITY

Section 1.   Seniority, as used in and applied to the Articles and LOAs of this Agreement, is defined as Net Credited Service as determined by the Administrative Committee.

Section 2.   If more than one (1) employee has the same Seniority date, the last four digits of the Social Security Number (SSN) will be used to establish the ranking.   The employee with the lowest number will be considered the most senior. If more than one (1) employee has the same Seniority Date and the last four (4) of the SSN, the middle two (2) digits will be used to establish the ranking. The employee with the lowest two (2) middle digits will be considered the most senior.

ARTICLE 12
HOURS OF WORK

Section 1.  Full-time employees will normally be scheduled to work forty (40) hours per week spread over five (5) days within the calendar week; however, if the Company determines emergency business needs require, other schedules may be used on a temporary basis.  Management will provide the local Union Representative and the affected employees with an explanation of the business needs **and the expected duration of the temporary condition**.

Section 2.  The scheduling of hours and days to be worked and any revisions thereof shall be determined exclusively by the Company, however:

a.   The Company, except as provided in b. and d. below, will assign work schedules on the basis of seniority as defined in Article 11.

b.   In the event there are business needs, as determined by the Company, requiring certain qualifications for particular work schedules, the Company shall offer such schedules on the basis of seniority to those employees the Company determines possess the required qualifications.  Management will provide the local Union Representative and the affected employees with an explanation of the underlying business needs requiring such scheduling and the expected duration.  Management will also convey its plans to prepare less senior employees to qualify for such work schedules.

c.   Work schedules shall be officially posted or furnished by the Company to show the scheduled tours the employee is to work at least one (1) week prior to the start of the work period covered by the schedule.  Such schedules shall include the starting and ending time of each of the tours making up the scheduled workweek.  For tours longer than five (5) hours, such schedules will also include the length of the period to be allowed for meals.

If no change is so posted or furnished prior to the time specified above, the schedule in effect for the employee for the last calendar week assigned to work shall be considered as that employee's work schedule for the next calendar week.

d.   If, during the period for which schedules have been established, the Company determines unexpected absences or business needs necessitate a change in the posted work schedule, the Company will reassign schedules by first seeking volunteers and then assigning employees by inverse seniority.  Whenever possible, the Company will notify employees at least forty-eight (48) hours in advance of the need for such schedule changes.

e.      A work schedule for an employee may be changed if the employee so requests and the Company approves such request.

**f.      When a New Hire Class is ready to be integrated into the Call Center (after all training is completed), the Company will initiate a mini-shift bid to integrate the New Hires into the existing schedule.**

> **(1)     Management will identify open slots that need to be filled.**

> **(2)     Prior to placing new hires into these open slots, management will make them available for any other employee in the center to bid on the open slots.**

> **(3)     Management will assign employees who have bid on open slots based on seniority order.**

> **(4)     New Hires will then be slotted into remaining available slots based on seniority until the next full shift bid.**

> **(5)     Any slots that become available as a result of the mini-shift bid will be filled with New Hires.  All other employees will remain on their existing schedules until the next full shift bid.**

Section 3.   Employees shall be permitted to take one (1) fifteen (15) minute break for every four (4) hours of work.  Such breaks shall be scheduled at the discretion of the Company.

Section 4.   When an employee works sixteen (16) hours or more in a twenty-four (24) hour period, the employee shall normally be allowed eight (8) hours for adequate rest time between such work period and the next work period.

## ARTICLE 13
## WORK ASSIGNMENTS

Section 1.   The Company shall determine whether to staff a position or fill a vacancy and the method or combination of methods it shall use for such purposes. In making this determination, the Company shall first give consideration to qualified laid off employees with applications on file in accordance with Article 14 Section 7 of this Agreement and then internal candidates prior to off-street applicants.  All vacancies within the Bargaining Unit shall be posted (manually or electronically) in locations where Bargaining Unit employees regularly work.  The posting shall include the title, wage range, and sufficient information regarding requirements and duties to adequately describe the vacancy.  The vacancy shall remain posted for seven (7) calendar days which shall be spread between two (2) workweeks.

Section 2.   In connection with Section 1. above, employees who have met the twelve (12) month time-in-title requirement and have satisfactory performance on their current job, shall be afforded the opportunity to apply for posted vacancies in the Bargaining Unit by submitting an application to the Company.

Section 3.   When a vacancy is to be filled from within the Bargaining Unit, Management will consider all qualified candidates who have submitted applications for the vacancy in question.  In selecting the employee to fill the position, the Company will first give due consideration to the candidates' qualifications and past performance relevant to the vacancy, and where those factors are relatively equal, in the judgment of the Company, it shall select on the basis of seniority.

Section 4.   The Company agrees to provide the Union, in writing, the names, titles and seniority dates of all candidates selected under this Article, by the fifteenth (15th) calendar day after any such selection is made.

ARTICLE 14
FORCE ADJUSTMENT

Section 1.  In the event that the Company determines that a surplus exists and a decrease in the work force becomes necessary, the Company will first advise the Union in writing **to the appropriate CWA District Staff and to the Local President** prior to notifying the affected employee(s). The affected employee(s) will be notified not less than thirty (30) calendar days prior to the date the employee(s) is to be laid off.  In matters involving the surplus of fifty (50) or more employees at a single location, the Company will provide the employees sixty (60) days advance notice of the surplus.

Section 2.  Under the circumstances set forth in Section 1., the Company **will** offer regular employees the opportunity to voluntarily resign and receive a severance payment as provided for in Section 5.  If applied, this will be offered in seniority order, up to the number necessary to alleviate the surplus.

Section  3.  Under the circumstances set forth in Section 1 and after the application of Section 2, regular employees will be given preference, in accordance with their seniority, subject to their skills and experience, to perform the remaining work in the event of a reduction in force.  Temporary employees and contractors will be separated under these circumstances before applying the seniority policy to regular employees.  In the event a contractor has been secured for a specific project and is providing a service that regular employees cannot perform, they will be retained until completion of the project.

Section  4. If  a  surplus  remains  after  application  of  Section 3. preceding, any remaining **active** surplus regular employees will be given priority **placement** for laterals* and downgrades* for which they are qualified, by order of seniority, to fill any available job vacancies within the Bargaining Unit.  For the purposes of this Section if there are no equal level or lower level vacancies for which the employee is qualified within **thirty-five (**35**)** miles of the surplus location, the surplused employee can decide to resign and receive a severance payment under Section 5 of this Article. In cases where the work is moved more than **seventy-five (**75**)** miles, the Company may offer a relocation incentive.

* Downgrades:  Movement to a wage scale that has a lower top rate than the current position.

* Laterals:  Movement to a wage scale with the same top rate as the current position.

Section 5.  Severance Payments.  If the Company determines that a surplus exists as described in Section 1. preceding, resulting in the layoff of a regular employee, that employee shall be eligible for a $700 Severance Payment or payment equivalent to one week's wages (whichever is greater),

for each completed six (6) months of Continuous Service during the first year of employment and an additional $700 or payment equivalent to one week's wages (whichever is greater), for each subsequent completed year of Continuous Service up to a maximum of **18**,**000**.

Section 6.   For purposes of this Article, "Continuous Service" means the number of completed years served by the employee with the Company beginning with the date of the employee's most recent engagement (or reengagement) and ending with the effective date of the employee's termination.   A period of Continuous Service is not broken by a leave of absence.   For employees who were on the payroll or on an authorized leave of absence as of January 8, 2001, and who remain in the continuous active service of the Company, their Net Credited Service in whole years (as determined by the Administrative Committee) upon the effective date of their termination shall be considered their period of Continuous Service with regard to the application of the provisions of this Article.

Section 7.   A former surplus employee who has been laid off and who files an application for employment will be given priority consideration over off-street applicants for vacancies for which he/she qualifies for a period of two (2) years from the date of layoff. The Company will maintain a process that identifies laid off employees who have employment applications on file for the period required.

Section 8.   In the event the Company determines a rearrangement of the Retail Sales workforce becomes necessary due to a workforce imbalance or store closing, the Company will advise the CWA Local(s) representing affected employees prior to notification of the employees.   The Company will endeavor to notify affected employees seven (7) days prior to the effective date of their reassignment.

Qualified employees of a Retail Sales Office who are reassigned in this manner will be given an opportunity to select another work location from available locations, as determined by management, based on their seniority.

Time-in-title achieved in an employee's current work location, under these circumstances, will follow an employee to the new work location.

## ARTICLE 15
## NON-DISCRIMINATION

The Company and the Union agree that they will not discriminate against any employee covered by this Agreement because of such employee's race, color, religion, sex, age, national origin, marital status, sexual orientation, **gender identity and expression**, or because of **an employee's** position or membership/non-membership in the Union or lawful activities on behalf of the Union, or because the person is disabled, a disabled veteran, or veteran of the Vietnam Era, or other protected classifications recognized by Federal or applicable state/local law.

Nothing in this Agreement shall be applied or interpreted to restrict the Company from taking such action as it deems necessary to fully comply with any federal, state or local laws, statutes, ordinances, rules, regulations and executive orders.  The arbitration provisions of this Agreement shall not apply to any such actions or to any complaints, allegations, or charges of unlawful discrimination.

## ARTICLE 16
## SAFETY

Section 1.   Safety and health is a mutual concern of the Company and the Union.  It benefits all parties to have employees work in safe and healthful environments and for employees to perform their work safely and in the interests of their own health.  The Company agrees to maintain a safe and healthy workplace for all employees.  It is also necessary to promote a better understanding and acceptance of the principles of safety and health on the part of all employees, in order to provide for their own safety and health and that of their fellow employees, customers and the general public.

To achieve the above principles, the Company and the Union agree to establish for the duration of this Agreement an advisory committee known as the National Occupational Safety and Health Committee.   The National committee shall consist of not more than four (4) representatives each from the Company and the Union (to be appointed by the Company and the Union, respectively and co-chaired by one representative appointed by the Company and one representative appointed by the Union).  This committee shall meet from time to time as required, but at least semi-annually and more often as mutually agreed upon by the co-chairs.

This committee shall be charged with the responsibility to develop facts and recommendations so that both parties can make well-informed decisions regarding occupational safety and health matters.  Information obtained by the committee may be used to develop training that may be delivered by the most efficient method to include but not limited to online or leader led training.

The committee shall focus on all matters pertaining to occupational safety and health, including ergonomic concerns in the workplace.  It shall also consider existing practices and rules relating to safety and health and formulate suggested changes in design and adoption of new practices and rules.

In connection with the Occupational Safety and Health Committee meetings under this Article, the employee representative(s) designated by the Union shall suffer no loss in pay for time consumed in, and necessarily consumed in traveling to and from, these meetings.

Section 2.   Local Occupational Safety and Health Committees (Local Committee[s]) may be established by mutual agreement and under the direction of the National Committee to address specific safety issues that may develop from time to time at the market level.  Local Committees shall be comprised of no more than three (3) representatives each from the Company and the Union (to be appointed by the company and the Union respectively). The Committee shall meet as often as necessary to address specific issues within specific time lines (as mutually agreed to by the parties).   When charged by the National co-chairs, a Local Committee will have sixty (60) days

21

to address the issue and develop recommended solution(s) to the specific safety issue the committee is charged to address. These Local Occupational Safety and Health Committees may be dissolved by either party with fourteen (14) days written notification to the other party.

Section 3.  None of the terms of this Agreement shall be applied or interpreted to restrict the Company from taking whatever actions are deemed reasonably necessary to fully comply with laws, rules and regulations regarding safety, and grievance and arbitration provisions of this Agreement shall not apply to any such actions.  Discipline for failure to observe safety rules shall be grievable and arbitrable under the terms of this Agreement. Other matters relating to safety may be raised under the Grievance Procedure but not arbitrated.

Section 4.  When a state or local government declares a State of Emergency, the Company will consider the circumstances of the event that prompted that declaration prior to disciplining the impacted employees for tardies and absences caused by the event.

## ARTICLE 17
## COMPANY-UNION RELATIONSHIP

Section 1.   The Company and the Union recognize that it is in the best interests of parties, the employees, and the public that all dealings between them continue to be characterized by mutual responsibility and respect.   To ensure that this relationship continues and improves, the Company and the Union and their respective representatives at all levels will apply the terms of this Agreement fairly in accord with its intent and meaning and consistent with the Union's status as exclusive bargaining representative of all employees in the Bargaining Unit.   Each party shall bring to the attention of all employees in the Bargaining Unit their purpose to conduct themselves in a spirit of responsibility and respect and the measures they have agreed upon to ensure adherence to this purpose.

The Company will notify the Union monthly of new employees entering the Bargaining Unit and of current employees who have been transferred or released. During the orientation of new hires, each party will bring to the attention of new employees the relationship between the parties and the Union's status as exclusive representative of those employees in the Bargaining Unit.   The Union Representative shall suffer no loss in wages for time spent while in the meeting.

The Company may allow the Union to display CWA shield logos, as provided by the Union, in mutually agreed to Company owned retail locations. The cost of such placement will be shared equally by the Union and the Company.

Section 2.   The Union will keep the Company fully informed, in writing, on a current basis, of all local Union officers, Union stewards, or Union representatives who may be designated with the responsibility of representing the Union regarding the administration of this Agreement.

Section 3.   At any meeting between a representative of the Company and an employee in which discipline (including warnings which are to be recorded as such in the personnel file, suspension, demotion, or discharge) is to be announced, a Union representative may be present if the employee so requests.   Time spent in such a meeting shall be considered work time.

Section 4.   Union representatives may request a reasonable amount of time off without pay for Union activities.   Such requests for time off must be submitted in writing to the Union representative's supervisor at least five (5) working days in advance, whenever possible.   The Company will endeavor to accommodate the request consistent with business needs.

Section 5. Time off for Union activities will be limited to 300 hours per calendar year per Union representative which may be combined within a Local, but may not exceed 600 hours per Union representative per calendar year. Up to **two (2)** Union representatives **per local** may each be granted up to 960 hours per calendar year for Union activities. **When a member of the local also serves as the Local President**, **up to three (3) Union representatives per local may each be granted up to 960 hours per calendar year for Union activities**. However, those identified by the Union may be granted additional time upon approval at the Company bargaining level. The period of such time off shall not be deducted from the Union representative's seniority.

The parties agree that the provisions of Section 2.b. of Article 21, Absences, shall not be used for Union functions.  Time off to engage in formal negotiations for subsequent collective bargaining agreements shall not be counted towards the limitations outlined in this section.

Section 6.   Subject to the limitations in Sections 4. and 5. of this Article and in this Section 6, when an officer or designated representative of the Union requires time off from assigned Company duties to attend solely to Union matters, either before or after exhausting the time allowed without pay provided in Section 5. above, he or she will be granted a leave of absence without pay upon the request of the Vice President of the Union to the Director-Labor Relations of the Company, provided that:

a. No such leave of absence shall be for an initial period of less than thirty-one (31) calendar days or more than one (1) year, nor shall the total cumulative period of all such leaves of absence for any one (1) employee exceed ten (10) years; and

b. No more than three (3) Union officers or designated representatives from each CWA District covered by this Agreement may be granted such leaves of absence at any one time at the request of the Union.

c. All Union leaves of absence will be granted with the following conditions:

(1)   During the absence the employee shall retain eligibility, if any, according to term of service, for the Medical Plan, the Dental Plan, the Group Life Insurance Plan, and the Vision Plan, provided that:

(a)   The employee shall pay the premiums for the Medical Plan, the Dental Plan, the Vision Plan, the Supplementary Group Life Insurance Plan, the Dependent Group Life Insurance Plan; and

(b)   The Company shall pay the premium for the Group Life Insurance Plan, (Basic and Accidental Death or Dismemberment).

(2)   During the absence the employee shall retain eligibility, if any, according to term of service to:

(a)   Payments for absence due to illness during the first seven (7) calendar days after expiration of the leave per Article 21, Section 6.

(b)   Disability benefits beginning on the eighth (8th) calendar day after expiration of the leave

(c)   Death benefits and service or deferred vested pension

(3)   The period of absence will not be deducted in computing term of employment, and the period of absence will not be credited for wage progression purposes.

(4)   The pension shall not in any manner be affected by a Union leave of absence.  Should an employee on such leave elect to retire at the termination thereof, the employee's pension, if any, shall be computed as if the employee were continually employed during the period of leave.

(5)   An employee granted a leave of absence under this section will, upon expiration of such leave, be returned to the former (or equivalent) position.

Section 7.  A Working Relations Committee will be created for the purpose of discussing broad concerns of mutual interest to the parties. Committee proceedings shall not be used in lieu of the grievance or arbitration procedures.  There will be one Committee for each CWA District covered by this Agreement.

a.  The Committee shall consist of no more than four (4) representatives designated by the Company and no more than four (4) representatives designated by the Union.   In addition, a representative from the CWA International and a representative from AT&T Mobility **Services** LLC, Human Resources will also attend.  In connection with attendance at Working Relations Committee meetings, the employee representative(s) designated by the Union shall suffer no loss in pay for time consumed in, and necessarily consumed in traveling to and from, these meetings.  Reasonable travel expenses will be paid for by the Company.

b.  The Committee may meet every six (6) months upon request of either party, or more frequently upon the mutual agreement of the parties, for the purpose of discussing whatever agenda either party may wish to present, including but not limited to subcontracting and supervisors' performance of Unit work.

c.  Discussions and decisions of the Committee shall not add to, subtract from or modify in any manner whatsoever the terms and conditions of this Agreement nor shall they constitute mid-term bargaining or be subject to the grievance and arbitration provisions of this Agreement.

## ARTICLE 18
## UNION ACTIVITIES

The Union shall be permitted space to place bulletin boards on Company property.  Such bulletin boards are to be used exclusively by the Union.  The number of bulletin boards and their location shall be mutually agreed upon by the Union and the Company.  Bulletin board material shall normally include the following:

a.  Notices of Union recreational and social affairs;

b.  Notices of Union elections, appointments, and results of Union elections;

c.  Notices of Union meetings;

d.  Other factual notices, information and announcements concerning official business of the Union.

Such material shall be posted and/or removed only by an official Union representative or a person designated by an official Union representative.

## ARTICLE 19
## BASIS OF COMPENSATION

Section 1.     Rates of Pay.

a.   The rates of pay and progression wage scales for full time employees shall be those shown in Appendix A.

b.   Starting Rates:   Each employee who enters the service of the Company shall normally begin employment at the Start Rate for the appropriate job title, except that appropriate allowance over such starting rate may be made by the Company for an employee who has had previous experience or training considered to be of value.

   If the Company hires an employee with no prior training or experience at a rate of pay higher than the Start Rate, it shall raise the existing wage rate of all incumbents in that title and Market to match the rate of pay for the newly hired employee effective with the date of hire.

c.   When a (voluntary) change of title occurs, and is considered a promotion, fifteen ($15.00) dollars will be applied to the employee's current weekly pay rate. The employee will then be slotted into the closest step in the new schedule that is equal to, but not less than, that new amount.  The time interval to the next step increase on the new wage schedule will be six (6) months from the date of the change in title.  In the event an employee is over the top of the new wage scale, that employee will be placed at the top of the new schedule.

   When a (voluntary) change of title occurs, and is considered a demotion, the employee will be slotted into the closest step in the new schedule that is equal to, but not less than, the weekly rate of their former schedule provided that rate is not greater than the maximum rate for the job.  The time interval to the next step increase on the new wage schedule will be six (6) months from the date of the change in title.  In the event an employee is over the top of the new wage scale, that employee will be placed at the top of the new schedule.

   When an (involuntary) change of title occurs, and is considered a demotion, the employee will be slotted into the closest wage step in the new schedule that is equal to, but not less than, the weekly rate of their former schedule provided that rate is not greater than the maximum rate for the job.  The time interval to the next step increase on the new schedule will be six (6) months from the date of the change in title.  In the event an employee is over the top of the new wage scale, that employee will be pay protected at their current wage for a period of one (1) year.

When an employee's title changes on the same date that a step increase is due, the step increase will be applied before the move to the new Wage Schedule.

When a (voluntary or involuntary) lateral transfer within the same title occurs, an employee will remain on his/her current wage step or will be slotted at the current Start Rate for the appropriate job title in the receiving Market, whichever is greater.

d.  **For the purposes of slotting under Article 19, Section 1.c., the Retail Sales Consultant position (RSC) "at risk" as provided for in LOA 16 will be converted to a weekly amount (prorated for part-time employees) and applied to the RSC employee's current weekly rate of pay prior to slotting.**

**The "at risk" described above will also be used ("at risk" weekly amount applied to the top step of the RSC Scale) under Article 14, Section 4. for determining if the movement to/from the RSC title is a downgrade, lateral or promotion for all other titles in the bargaining unit.**

e.  Anytime an employee moves to another job and subsequently retreats (employee or company initiated) to the former job within six months; for wage purposes the employee will be treated as though he or she never left the former job.

Section 2.   Nothing in this Agreement shall affect or limit the right of the Company to develop and implement such incentive programs as it chooses; or to pay such individual bonuses or commissions in such amounts or percentages as it may desire, either in connection with specific incentive programs or otherwise.  If and to the extent that any such incentive programs, individual bonuses, or commissions may be awarded, such award shall not constitute a binding precedent or practice with respect to any future incentive programs, individual bonuses, or commissions.

The Company agrees to provide affected employees with a written statement of their commission plans, including any changes which might be made thereto from time to time, in advance of the effective date of such plan or changes.  Such statement shall reflect the method of computation of such commissions.

The Company agrees to notify the Union prior to notifying affected employees of changes made in incentive programs, bonuses, or commissions under the provisions of this Section.  It is further the Company's intent to provide, whenever practicable, at least one (1) week's advance notice to the CWA.

Section 3.   Employees shall receive one and one-half (1½) times their regular rate of pay for all time worked in excess of eleven (11) consecutive hours within a workday or forty (40) hours within the workweek.  For the sole purpose of computing the number of hours worked in excess of eleven (11) consecutive hours within a workday or forty (40) hours within a workweek, Holidays shall be considered time worked.

Section 4.   Employees who are assigned on-call duty will be paid **thirty-seven ($37) dollars** for each day of such assignment.  This payment shall be in addition to any applicable compensation from such duty.

Section 5.   Network employees who are called to work outside scheduled work hours will be paid a Call Out payment, equal to one (1) hour of their basic wage rate, for any work performed, single incident or accumulated incidents, when the aggregate total of work is one (1) hour or less. Additional work performed beyond this one (1) hour period that occurs before the employee's next scheduled work hours will be paid as work time.

Section 6.   Employees, who are called by a supervisor or designate to report to work, or to perform work from home, shall be paid at the applicable rate of pay for actual time worked.  If such call requires an employee to make a round trip between their place of residence and their place of work in addition to their normal commute to and from work, the employee shall be compensated at their applicable rate of pay for the time required to make such additional round trip.

Section 7.   Employees performing work on Sunday shall be paid a premium of ten (10) percent of their basic wage rate.

Section 8.   A night differential shall be paid to employees for each hour, or fraction thereof, worked after 8 p.m. and before 6 a.m. in the amount of ten (10) percent of the employee's basic hourly rate.

Section 9.   A relief differential consisting of ten (10) percent of the employee's basic hourly wage rate will be paid to any employee who is assigned to relieve or assist a manager, for each hour, **of fraction thereof**, the employee performs this work or receives associated training.  These assignments may involve planning, distributing, directing, coordinating, training responsibilities and performing managerial opening and/or closing (Key Holder) responsibilities. In no event shall such assigned employee have any involvement in discipline or performance evaluation of other employees. An employee involved in such training and/or assignment shall continue to be subject to all applicable provisions of this Agreement.

Section 10.  A qualified employee who is temporarily assigned and performs the duties of a job title with a higher top wage rate will be paid a temporary upgrade differential consisting of five (5) percent of the employee's basic hourly wage rate for each hour, or fraction thereof, such duties are

performed not to exceed the top hourly wage rate of the job title they have been assigned.

Section 11.  A Multilingual Differential consisting of five ($5.00) dollars per day, not to exceed twenty-five ($25.00) dollars per week, shall be paid to Call Center employees for each full day worked when assigned by Management to speak in a foreign language.

ARTICLE 20
TRAVEL

Section 1.   Time spent in local travel at the direction of the Company after reporting for duty and before release from duty shall be treated as work time.

Section 2.   Employees authorized by the Company to use their personal car for travel between work locations during the workday or for other authorized Company business shall be paid at the IRS allowable reimbursement rate.  Employees opting to use alternative transportation (i.e. bus, subway, cab) for such travel shall be paid the cost of that transportation not to exceed the IRS allowable reimbursement rate for the use of a personal car for that same trip.

Section 3.   Employees will be assigned a regular work location but may also be assigned to work at a temporary location.

   a.   Any travel time on a scheduled day necessitated by the temporary assignment which occurs prior to reporting for duty and/or after release from duty and which exceeds the employee's normal commute will be paid as work time.

   b.   Any travel time on a nonscheduled day that occurs during an employee's normal scheduled hours shall be paid as work time.

   c.   The Company will reimburse employees (not covered by a monthly car allowance as determined by the Company) for use of their personal car at the IRS allowable reimbursement rate per mile rate specified in Section 2. above, for that portion of any trip that occurs while the employee is being paid for work time.

Section 4.   An employee away from home on a Company assignment will receive reimbursement for all reasonable, necessary and ordinary business expenses incurred in the fulfillment of such assignment.  All such expenses shall be supported by an original receipt.

ARTICLE 21
ABSENCES

Section 1.  All absence shall be without pay except as otherwise provided in this Article.

Section 2.

a.   Employees who are eligible under the provisions of the Family and Medical Leave Act of 1993 will be subject to the provisions of that Act and to subsequent changes in the Act as they may occur.

b.   Any employee may request up to thirty (30) continuous days of absence, giving due consideration to the Company's ability to replace their services.  Such time off shall be granted at the discretion of the Company.  Such employees shall suffer no break in service or loss of benefits.  An employee need not exhaust their contractual time off prior to taking this leave of absence.  Upon return, these employees shall be reinstated to their former job title and rate of pay.

c.   Periods of absence in excess of thirty (30) days (leaves of absence) are governed by the provisions described in the Leave of Absence Summary Plan Description (SPD). All such leaves must be requested in writing.

Section 3.   Military Leave.

a.   In the event employees covered by this Agreement are required to absent themselves for the purpose of performing military duty in the United States Armed Forces or the National Guard, the Company will comply with all applicable legislation in granting such employees' requests for leaves of absence and reinstatement after the performance of their military duty.  If such employees are required to absent themselves for the purpose of performing military training or emergency duty in the United States Armed Forces or the National Guard, and such duty requires absence during scheduled Company work hours, the employee shall be excused for such military duty for a period, in the aggregate, not exceeding fifteen (15) calendar days in the same calendar year. Difference in pay shall be allowed for the number of scheduled workdays falling within the periods of excused absence, but not to exceed eleven (11) such days within the calendar year. This difference in pay is not applicable to periods of active duty that are in excess of thirty (30) consecutive calendar days.

b.    The difference in pay allowed in paragraph a. above shall mean the excess, if any, of Company pay at the employee's basic hourly rate for such absent time (plus any night or other differentials normally applicable) over the hourly equivalent of the employee's government base pay obtained by dividing the monthly government base pay rate by two hundred forty (240).

c.    Employees called to military duty will immediately inform their supervisors and then will provide copies of their military orders as soon as possible.

Section 4.  Civic Duty.   An employee who serves during his/her regularly scheduled work time as a subpoenaed witness in a court case in which the employee is not a party, as a witness for the Company, or as a petit juror shall be paid the difference between the employee's basic wage rate and the amount received for such service.

Section 5.   Funerals.  An employee shall be paid up to three (3) days at his/her basic wage rate for the necessary scheduled time absent due to the funeral of a member of the immediate family.  The leave may not begin until the day of death, and not extend more than two (2) days beyond the day of the funeral.   For purposes of this Section, immediate family shall mean spouse, legally recognized partner, children, sister, brother, mother, father, former legal guardian, stepparents, mother-in-law, father-in-law, daughter-in-law, son-in-law, brother-in-law, sister-in-law, grandmother, grandfather, grandson, granddaughter, stepson, stepdaughter, and parent of an employee's dependent child.  Payment for such absent time shall consist of basic pay which would otherwise have been received had the regular shift been worked.  Pay for part-time employees will be pro-rated based on the ratio of their equivalent workweek compared to that of a full-time employee.

In the event of the death of an employee's wife, husband, daughter, son, mother, or father, or legally recognized partner, an employee shall, upon the employee's request, be excused from scheduled time up to an additional five (5) days.  An employee may request one (1) additional day without pay, if the funeral of any other member of the immediate family described above is held more than 200 miles from the employee's home address.   Paid individual days may be substituted for these excused days at the employee's option.

Section 6.   Illness and Injury.

a.   Employees having one (1) or more years of Net Credited Service shall be paid at the basic wage rate for absence of at least one (1) session due to illness on scheduled workdays, for a period of time not to exceed seven (7) consecutive calendar days, in accordance with the following table:

| Employees with Net Credited Service of | To be Paid After Waiting Periods of Consecutive Scheduled Working Days | Maximum Paid Days in a Calendar Year |
|---|---|---|
| 1 year but less than 5 | 1 day | 10 paid days |
| 5 years and over | No Waiting Period | 10 paid days |

b.   **The maximum amount of paid illness time for an employee covered by this Article hired after January 1, 2018 shall be five (5) days or forty (40) hours, prorated for part-time, in a calendar year.  Nothing in this Agreement shall be interpreted to provide for paid illness time in excess of this amount for such employees.**

c.   A day in the waiting period shall be considered as an absence of at least one (1) session from scheduled time.

d.   For purposes of this Article, tours are the assignments for full days and sessions are the two (2) parts into which tours are divided.

## ARTICLE 22
## VACATIONS

Section 1.  Employees shall earn vacation at their basic rate of pay based on Net Credited Service (NCS) in accordance with the following schedule:

a.   Where eligibility for paragraphs (1) and (2) below occurs after November 30 of the calendar year, the vacation may be scheduled as late as the last week in February of the next calendar year.

(1)   One (1) week of vacation upon completion of six (6) months;

(2)   Two (2) weeks of vacation upon completion of twelve (12) months.  This provision cannot be combined with above, to result in more than two (2) weeks of vacation entitlement in the same calendar year.

b.   Eligibility for vacation leave benefits to be taken in any calendar year shall be based on the NCS the employee has obtained, or could obtain within that calendar year.

(1)   Three (3) weeks of vacation to any such employee who could complete five (5) years or more but less than ten (10) years of NCS within the vacation year;

(2)   Four (4) weeks of vacation to any such employee who could complete ten (10) years or more but less than twenty (20) years of NCS within the vacation year;

(3)   Five (5) weeks of vacation to any such employee who could complete twenty (20) years or more of NCS within the vacation year.

Employees shall earn the vacation they are eligible for above proportionately during the calendar year, but this will not affect when vacation can be selected in accordance with Section 6 or taken within the vacation year.

Section 2.  The year in which vacation leave may be taken shall be known as the "vacation year".  A maximum of one (1) week of vacation may be carried over into the next vacation year, to be used in the first quarter, consistent with the scheduling provisions outlined in Section 6.  A vacation year is defined as a period of time beginning January 1 and ending on December 31.

Section 3.  If, before receiving the vacation to which he or she has earned, as provided for in Section 1. of this Article, a**n** employee is dismissed (except for reason of misconduct **in which case the employee waives and forfeits any right the employee may have to receive pay for vacation earned at the time of termination including any rights under California Labor Code Section 227.3 or any similar law in another state**), resigns, or retires, such employee will be entitled to an allowance in cash equal to and in lieu of such vacation based on the following table:

| Month Employee Leaves Company | Calendar Year Eligible Vacation Hours (See Section 1 above for eligibility) | | | | |
|---|---|---|---|---|---|
| | 1 Week (40 Hours) | 2 Weeks (80 Hours) | 3 Weeks (120 Hours) | 4 Weeks (160 Hours) | 5 Weeks (200 Hours) |
| | Number of "Earned" Current Year Vacation Hours | | | | |
| Jan. | 3 | 7 | 10 | 13 | 17 |
| Feb. | 7 | 13 | 20 | 27 | 33 |
| Mar. | 10 | 20 | 30 | 40 | 50 |
| Apr. | 13 | 27 | 40 | 53 | 67 |
| May | 17 | 33 | 50 | 67 | 83 |
| Jun. | 20 | 40 | 60 | 80 | 100 |
| Jul. | 23 | 47 | 70 | 93 | 117 |
| Aug. | 27 | 53 | 80 | 107 | 133 |
| Sep. | 30 | 60 | 90 | 120 | 150 |
| Oct. | 33 | 67 | 100 | 133 | 167 |
| Nov. | 37 | 73 | 110 | 147 | 183 |
| Dec. | 40 | 80 | 120 | 160 | 200 |

If an employee dies or is laid off before receiving his/her unused vacation for the vacation year, as provided for in Section 1. of this Article, payment in lieu of vacation will be made for all  unused vacation time to the employee or employee's estate in the event of death.

Section 4.  If a fixed Holiday falls within a period of vacation, another day of vacation may be scheduled in the vacation year.  Additional vacation days in lieu of the Christmas Holiday may be taken, in accordance with force requirements, either immediately prior to the vacation period or through the month of March of the next calendar year.

Section 5.  Any employee may select up to one (1) week of vacation on a day-at-a-time basis during the vacation selection process described in Section 6. of this Article.  Any employee, if eligible for three (3) or more weeks of vacation, may elect to take up to two (2) weeks vacation on a day-at-a-time basis during the vacation selection process described in Section 6. of this Article.  Individual vacation days may be taken in half-day increments.

Section 6.  Vacations shall be selected in a work group based on seniority.  Periods available for selection shall take into consideration the needs of the Company, force requirements, and the desires of the employees. Reasonable effort should be made by management to make available the maximum number of vacation weeks during the most desirable vacation periods.  Advance selection of vacation periods shall commence on or after November 1 and shall conclude no later than December 31 of the year preceding the year in which such vacation leave is to be taken.

   a.   Employees must first express preference for full weeks including full carry over weeks of vacation in seniority order within the work group.

   b.   Employees will then express preference for day-at-a-time usage, also in seniority order within the work group. The employees may select day-at-a-time vacation days as provided in Section 5. above, and day-at-a-time carry over, his/her Floating and Designated Holidays as provided in Article 23, and Excused Days with Pay as provided in Article 24 of this Agreement.  Individual days not selected at this time and days to be taken in half-day and/or two (2)-hour increments will be granted, consistent with force requirements, on the basis of the earliest request ("first-come, first-served") to the employee's immediate supervisor, or such other manager as may be designated.

Section 7.  Employees who are normally scheduled to work more than nineteen (19) but less than forty (40) hours per week will earn pro-rated vacation pay based on their "average equivalent workweek".  The "equivalent workweek" will be determined by dividing the employee's total hours worked per month by 4.35, rounding the result to the next higher whole number.  The "average equivalent workweek" will be determined by the average over the past six (6) months.

ARTICLE 23
HOLIDAYS

Section 1.  Each full-time employee shall receive eight (8) hours of pay at the employee's basic straight-time rate of pay, unless otherwise provided for in this Agreement, provided that such employee, if excused from work on a Holiday, shall have worked all hours scheduled on the last scheduled workday before and on the first scheduled workday after the Holiday, or the day celebrated as such, unless excused by Management (not applicable to the use of Floating Holiday(s) or Designated Holiday unless the Designated Holiday is scheduled by the Company).   Employees who are normally scheduled to work more than nineteen (19) but less than forty (40) hours per week will receive pro-rated holiday pay based on their "average equivalent workweek". The "equivalent workweek" will be determined by dividing the employee's total hours worked per month by 4.35, rounding the result to the next higher whole number. The "average equivalent workweek" will be determined by the average over the past six (6) months. Employees who are absent without pay for thirty (30) or more calendar days shall not be eligible for holiday pay. The Holidays shall be:

| | |
|---|---|
| New Year's Day | Thanksgiving Day |
| Memorial Day | Day After Thanksgiving |
| Independence Day | Christmas Day |
| Labor Day | Two Floating Holidays[*] |
| | One Designated Holiday[**] |

The Designated Holiday may be scheduled by the Company in accordance with the needs of the business. Such designation will be made prior to the advance vacation selection period outlined in Section 6. of Article 22, Vacations. Should the Company not schedule the Designated Holiday, employees may select the day on which to celebrate their Designated Holiday, as well as their Floating Holidays, in accordance with the provisions of Article 22, Vacations, Section 6.b.

[*] For new employees, Floating Holiday eligibility is one (1) Floating Holiday after the first three (3) months of Net Credited Service and a second Floating Holiday after six (6) months of Net Credited Service.  A Floating Holiday earned after October 31 may be carried over into the next year, to be used in the first quarter, consistent with the scheduling provisions outlined in Section 6.b. of Article 22, Vacations.

[**] Each new employee who completes six (6) months of Net Credited Service within the calendar year shall be eligible for one (1) Designated Holiday. A Designated Holiday earned after October 31 that is not scheduled by the Company may be carried over into the next year, to be used in the first quarter, consistent with the scheduling provisions outlined in Section 6.b. of Article 22, Vacations.

Section 2.   When a Holiday falls on a Sunday, it will be observed on the following Monday.  When a Holiday falls on a Saturday, it will be observed on the preceding Friday.

Section 3.   Employees who work on a Holiday shall be paid for such work at time and one-half for all work on such Holidays, together with the holiday pay provided for in Section 1. above.

Section 4.   Eligible employees who have been scheduled to work on a Holiday and fail to do so shall not receive pay for the Holiday.

Section 5.   No compensation shall be paid to an employee for unused Floating or Designated Holidays after separation from service.

Section 6.  The Company will normally post changes of Holiday schedules by 12:00 noon on the Friday three (3) weeks prior to the Holiday.

## ARTICLE 24
## EXCUSED DAYS WITH PAY

Section 1.

a.   During the first twelve (12) months of employment, each regular employee will be eligible for one (1) Excused Day With Pay (EWP) after each successive three (3) months of completed service with the Company.

b.   In the vacation year during which a regular employee completes twelve (12) months of service, he/she will be eligible for a total of four (4) EWPs as follows:  Such employee will, after twelve (12) successive months of completed service with the Company, be immediately eligible for any of these four (4) EWPs over and above those earned in accordance with the provisions of subparagraph a. above.

c.   A regular employee will then be eligible for four (4) EWPs on the first day of each subsequent vacation year.

Section 2.  All days off as provided in this Article shall be selected in accordance with Section 6.b. of Article 22, Vacations.  Employees may be permitted to take their EWPs in one (1) hour increments.  All pay for EWPs shall be at the employee's basic rate of pay.

Section 3.  EWPs may be carried over and taken through the month of March of the next calendar year.

Section 4.  If, before receiving the EWP(s) to which he or she has become entitled, as provided for in Section 1. of this Article, an employee is dismissed (except for reason of misconduct **in which case the employee waives and forfeits any right the employee may have to receive pay for any EWPs earned at the time of termination including any rights under California Labor Code Section 227.3 or any similar law in another state**), laid off, resigned, or retired, such employee will be entitled to an allowance in cash equal to and in lieu of such EWP(s).

If an employee dies before receiving his/her unused EWP(s) for the vacation year, as provided for in Section 1. of this Article, payment in lieu of EWP(s) will be made for any unused EWP time to the employee's estate.

Section 5.  Employees who are normally scheduled to work more than nineteen (19) but less than forty (40) hours per week will receive pro-rated pay for EWPs based on their "average equivalent work week".  The "equivalent work week" will be determined by dividing the employee's total hours worked per month by 4.35, rounding the result to the next higher whole number.  The "average equivalent work week" will be determined by the average over the past six (6) months.

## ARTICLE 25
## EXCHANGE TIME

Exchange Time allows an employee to request time off during a scheduled workday to be made up within the workweek (Sunday through Saturday).  Granting of Exchange Time will be subject to business needs as determined by the Company.  If the Company approves an employee's request for such time off, it shall designate the time within the same workweek when the absence shall be made up.

## ARTICLE 26
## WAIVER OF FURTHER BARGAINING

Section 1.   The parties acknowledge that this Agreement is the product of extensive and comprehensive negotiations which touched upon all matters of interest to each of them.  Both parties further acknowledge that each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter which would constitute a mandatory subject of bargaining.

In view of that history of bargaining the parties agree that this Agreement concludes all collective bargaining between them for the term of the Agreement; that all the understandings and agreements arrived at by the parties are set forth herein; that prior written practices and policies of management provided to the Union before the conclusion of collective bargaining and not incorporated into this Agreement may be continued by management; and that this Agreement constitutes the sole, entire and existing agreement between them, superseding all prior Agreements and undertakings, oral or written, expressed or implied, between the Company and the Union or its employees and expressing all obligations and restrictions imposed on each of the respective parties during its term.

Therefore, the Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right and each agrees that the other will not be obligated to bargain collectively with respect to any subject or matter whether or not such subject or matter is referred to or covered in this Agreement.  This waiver of further bargaining is intended to apply even though such subjects or matters may not have been even thought of or within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.

Notwithstanding the foregoing waiver, amendments to this Agreement mutually agreed upon by both parties may be made at any time, provided such amendments are reduced to writing and signed by the parties' authorized representatives, and any subject or matter may be raised and bargained if both parties mutually agree to enter into such bargaining.  In the absence of such an Agreement by both parties, the Company shall not make any changes in the terms and conditions of employment.

Section 2.   Neither the Company nor the Union by this Agreement waive any right, legal or equitable, which it would otherwise have except as specifically defined and provided in this Agreement, which sets forth all understandings and agreements arrived at by the parties.

## ARTICLE 27
## DURATION OF AGREEMENT

This Agreement shall become effective as of February **12, 2017** and shall continue until 11:59 p.m. on February **12, 2021**, at which time it will terminate unless extended by mutual agreement in writing prior to said termination date.

IN WITNESS WHEREOF, the parties have caused duplicate copies hereof to be executed by their duly authorized officers and representatives.

COMMUNICATIONS WORKERS OF AMERICA

Pat Telesco
Area Director
Communications Workers of America

Tonya Hodges, Staff Representative

Frank Oliva, District 1

Mike Baxter, District 1

Deborah Casey, District 2-13

Jeff Keamer, District 2-13

Julie Daloisio, District 2-13

Glen Skeen, District 4

Holly Sorey, District 4

Debbie Goulet, District 7

Hector Capote, District 7

Brandon Beck, District 9

Joe Sison, District 9

AT&T MOBILITY **SERVICES** LLC
**AT&T CUSTOMER SERVICES, INC.**

Brian Cattaneo
Lead Labor Relations Manager
AT&T

John Drespel
Stephen Papageorge
Kimberly Stinemetz

# APPENDIX A

## Administrative Assistant

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|------|------|------|------|------|
| 1 | 424.50 | 424.50 | 424.50 | 424.50 |
| 2 | 449.00 | 450.50 | 451.00 | 452.00 |
| 3 | 475.50 | 477.50 | 479.50 | 481.50 |
| 4 | 503.00 | 506.50 | 509.50 | 512.50 |
| 5 | 532.50 | 537.50 | 541.50 | 545.50 |
| 6 | 563.50 | 570.00 | 575.50 | 581.00 |
| 7 | 596.00 | 605.00 | 611.50 | 618.50 |
| 8 | 631.00 | 641.50 | 650.00 | 658.50 |
| 9 | 667.50 | 680.50 | 691.00 | 701.50 |
| 10 | 706.50 | 722.00 | 734.50 | 747.00 |
| 11 | 747.50 | 766.00 | 780.50 | 795.00 |
| 12 | 791.00 | 812.50 | 829.50 | 846.50 |
| 13 | 837.00 | 862.00 | 881.50 | 901.50 |

## Business Customer Service Specialist I

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|------|------|------|------|------|
| 1 | 418.00 | 418.00 | 418.00 | 418.00 |
| 2 | 439.50 | 440.50 | 441.00 | 442.00 |
| 3 | 461.50 | 464.00 | 466.00 | 467.50 |
| 4 | 485.50 | 489.00 | 491.50 | 494.50 |
| 5 | 510.00 | 515.00 | 519.00 | 523.00 |
| 6 | 536.00 | 543.00 | 548.00 | 553.00 |
| 7 | 563.50 | 572.00 | 578.50 | 584.50 |
| 8 | 592.00 | 602.50 | 610.50 | 618.50 |
| 9 | 622.50 | 635.00 | 644.50 | 654.00 |
| 10 | 654.00 | 669.00 | 680.00 | 691.00 |
| 11 | 687.50 | 705.00 | 718.00 | 731.50 |
| 12 | 722.50 | 742.50 | 758.00 | 773.50 |
| 13 | 759.50 | 782.50 | 800.00 | 818.00 |

## Business Customer Service Specialist II

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|------|------|------|------|------|
| 1 | 469.50 | 469.50 | 469.50 | 469.50 |
| 2 | 496.00 | 497.00 | 498.00 | 499.00 |
| 3 | 524.00 | 526.50 | 528.50 | 530.50 |
| 4 | 553.50 | 557.50 | 560.50 | 564.00 |
| 5 | 584.50 | 590.50 | 595.00 | 599.00 |
| 6 | 617.50 | 625.00 | 631.00 | 637.00 |
| 7 | 652.50 | 662.00 | 669.50 | 677.00 |
| 8 | 689.00 | 701.00 | 710.00 | 719.50 |
| 9 | 728.00 | 742.50 | 753.50 | 764.50 |
| 10 | 769.00 | 786.00 | 799.50 | 813.00 |
| 11 | 812.50 | 832.50 | 848.00 | 864.00 |
| 12 | 858.00 | 881.50 | 899.50 | 918.50 |
| 13 | 906.50 | 933.50 | 954.50 | 976.00 |

## Business Sales Specialist

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|------|------|------|------|------|
| 1 | 476.00 | 476.00 | 476.00 | 476.00 |
| 2 | 500.50 | 501.50 | 502.50 | 503.50 |
| 3 | 526.00 | 528.50 | 530.50 | 532.50 |
| 4 | 553.00 | 557.00 | 560.50 | 563.50 |
| 5 | 581.50 | 587.00 | 591.50 | 596.00 |
| 6 | 611.00 | 619.00 | 624.50 | 630.50 |
| 7 | 642.50 | 652.00 | 659.50 | 667.00 |
| 8 | 675.50 | 687.50 | 696.00 | 705.50 |
| 9 | 710.00 | 724.50 | 735.00 | 746.00 |
| 10 | 746.50 | 763.50 | 776.00 | 789.00 |
| 11 | 785.00 | 804.50 | 819.50 | 835.00 |
| 12 | 825.00 | 848.00 | 865.00 | 883.00 |
| 13 | 867.50 | 893.50 | 913.50 | 934.00 |

## Clerk

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 375.50 | 375.50 | 375.50 | 375.50 |
| 2 | 397.00 | 398.00 | 399.00 | 399.50 |
| 3 | 420.00 | 422.00 | 424.00 | 425.50 |
| 4 | 444.50 | 447.50 | 450.00 | 452.50 |
| 5 | 470.00 | 475.00 | 478.50 | 482.00 |
| 6 | 497.50 | 503.50 | 508.00 | 513.00 |
| 7 | 526.00 | 534.00 | 540.00 | 546.00 |
| 8 | 556.50 | 566.00 | 573.50 | 581.00 |
| 9 | 588.50 | 600.50 | 609.00 | 618.50 |
| 10 | 622.50 | 636.50 | 647.00 | 658.00 |
| 11 | 658.50 | 675.00 | 687.50 | 700.50 |
| 12 | 696.50 | 716.00 | 730.50 | 745.50 |
| 13 | 737.00 | 759.00 | 776.00 | 793.50 |

## Client Service Specialist

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 540.00 | 540.00 | 540.00 | 540.00 |
| 2 | 559.00 | 560.00 | 561.50 | 562.50 |
| 3 | 578.50 | 581.00 | 583.50 | 585.50 |
| 4 | 598.50 | 603.00 | 606.50 | 610.00 |
| 5 | 619.50 | 625.50 | 630.00 | 635.00 |
| 6 | 641.00 | 649.00 | 655.00 | 661.00 |
| 7 | 663.50 | 673.50 | 681.00 | 688.50 |
| 8 | 686.50 | 698.50 | 707.50 | 717.00 |
| 9 | 710.50 | 724.50 | 735.50 | 746.50 |
| 10 | 735.50 | 752.00 | 764.50 | 777.50 |
| 11 | 761.00 | 780.00 | 794.50 | 809.50 |
| 12 | 787.50 | 809.00 | 826.00 | 843.00 |
| 13 | 815.00 | 839.50 | 858.50 | 878.00 |

## Coordinator 1

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 530.50 | 530.50 | 530.50 | 530.50 |
| 2 | 556.00 | 557.50 | 558.50 | 559.50 |
| 3 | 582.50 | 585.50 | 587.50 | 590.00 |
| 4 | 610.50 | 615.00 | 618.50 | 622.00 |
| 5 | 640.00 | 646.00 | 651.00 | 656.00 |
| 6 | 670.50 | 679.00 | 685.00 | 691.50 |
| 7 | 703.00 | 713.50 | 721.00 | 729.50 |
| 8 | 736.50 | 749.50 | 759.00 | 769.00 |
| 9 | 772.00 | 787.00 | 799.00 | 811.00 |
| 10 | 809.00 | 827.00 | 841.00 | 855.00 |
| 11 | 847.50 | 869.00 | 885.00 | 901.50 |
| 12 | 888.50 | 913.00 | 931.50 | 950.50 |
| 13 | 931.00 | 959.00 | 980.50 | 1002.50 |

## Coordinator 2

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 575.50 | 575.50 | 575.50 | 575.50 |
| 2 | 601.50 | 603.00 | 604.00 | 605.50 |
| 3 | 629.00 | 632.00 | 634.50 | 636.50 |
| 4 | 657.50 | 662.00 | 666.00 | 669.50 |
| 5 | 687.00 | 694.00 | 699.00 | 704.00 |
| 6 | 718.50 | 727.00 | 734.00 | 740.50 |
| 7 | 751.00 | 762.00 | 770.50 | 779.00 |
| 8 | 785.00 | 798.50 | 809.00 | 819.50 |
| 9 | 820.50 | 837.00 | 849.00 | 861.50 |
| 10 | 857.50 | 877.00 | 891.50 | 906.50 |
| 11 | 896.50 | 919.00 | 936.00 | 953.50 |
| 12 | 937.00 | 963.00 | 982.50 | 1002.50 |
| 13 | 979.50 | 1009.00 | 1031.50 | 1054.50 |

## COS Sales Advocate

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|------|------|------|------|------|
| 1 | 375.50 | 385.00 | 385.00 | 385.00 |
| 2 | 395.50 | 406.50 | 407.00 | 408.00 |
| 3 | 417.00 | 429.00 | 430.50 | 432.00 |
| 4 | 439.50 | 452.50 | 455.00 | 457.50 |
| 5 | 463.00 | 477.50 | 481.00 | 485.00 |
| 6 | 488.00 | 504.00 | 508.50 | 513.50 |
| 7 | 514.00 | 532.00 | 538.00 | 544.00 |
| 8 | 542.00 | 561.50 | 568.50 | 576.00 |
| 9 | 571.00 | 592.50 | 601.50 | 610.50 |
| 10 | 601.50 | 625.50 | 636.00 | 646.50 |
| 11 | 634.00 | 660.00 | 672.00 | 685.00 |
| 12 | 668.00 | 696.50 | 711.00 | 725.50 |
| 13 | 704.00 | 735.00 | 751.50 | 768.50 |

## Customer Service Representative I

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|------|------|------|------|------|
| 1 | 418.50 | 418.50 | 418.50 | 418.50 |
| 2 | 440.00 | 441.00 | 441.50 | 442.50 |
| 3 | 462.00 | 464.50 | 466.00 | 468.00 |
| 4 | 485.50 | 489.50 | 492.00 | 495.00 |
| 5 | 510.50 | 515.50 | 519.50 | 523.50 |
| 6 | 536.50 | 543.00 | 548.00 | 553.50 |
| 7 | 564.00 | 572.50 | 578.50 | 585.00 |
| 8 | 592.50 | 603.00 | 610.50 | 618.50 |
| 9 | 622.50 | 635.00 | 644.50 | 654.00 |
| 10 | 654.50 | 669.00 | 680.50 | 692.00 |
| 11 | 687.50 | 705.00 | 718.00 | 731.50 |
| 12 | 722.50 | 742.50 | 758.00 | 773.50 |
| 13 | 759.50 | 782.50 | 800.00 | 818.00 |

## Customer Service Representative II

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|------|------|------|------|------|
| 1 | 433.50 | 433.50 | 433.50 | 433.50 |
| 2 | 460.50 | 461.50 | 462.50 | 463.00 |
| 3 | 488.50 | 491.00 | 493.00 | 494.50 |
| 4 | 519.00 | 522.50 | 525.50 | 528.50 |
| 5 | 551.00 | 556.50 | 560.50 | 564.50 |
| 6 | 585.00 | 592.00 | 597.50 | 603.00 |
| 7 | 621.00 | 630.50 | 637.50 | 644.50 |
| 8 | 659.50 | 671.00 | 679.50 | 688.50 |
| 9 | 700.50 | 714.00 | 724.50 | 735.50 |
| 10 | 743.50 | 760.00 | 773.00 | 785.50 |
| 11 | 789.50 | 809.00 | 824.00 | 839.50 |
| 12 | 838.00 | 861.00 | 878.50 | 896.50 |
| 13 | 890.00 | 916.50 | 937.00 | 958.00 |

## Customer Service Representative II - C2

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|------|------|------|------|------|
| 1 | 575.50 | 575.50 | 575.50 | 575.50 |
| 2 | 601.50 | 603.00 | 604.00 | 605.50 |
| 3 | 629.00 | 632.00 | 634.50 | 636.50 |
| 4 | 657.50 | 662.00 | 666.00 | 669.50 |
| 5 | 687.00 | 694.00 | 699.00 | 704.00 |
| 6 | 718.50 | 727.00 | 734.00 | 740.50 |
| 7 | 751.00 | 762.00 | 770.50 | 779.00 |
| 8 | 785.00 | 798.50 | 809.00 | 819.50 |
| 9 | 820.50 | 837.00 | 849.00 | 861.50 |
| 10 | 857.50 | 877.00 | 891.50 | 906.50 |
| 11 | 896.50 | 919.00 | 936.00 | 953.50 |
| 12 | 937.00 | 963.00 | 982.50 | 1002.50 |
| 13 | 979.50 | 1009.00 | 1031.50 | 1054.50 |

## Customer Support Specialist

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 520.00 | 520.00 | 520.00 | 520.00 |
| 2 | 540.50 | 542.00 | 543.00 | 544.00 |
| 3 | 562.00 | 564.50 | 567.00 | 569.00 |
| 4 | 584.00 | 588.50 | 591.50 | 595.00 |
| 5 | 607.00 | 613.50 | 618.00 | 622.50 |
| 6 | 631.00 | 639.00 | 645.00 | 651.00 |
| 7 | 656.00 | 666.00 | 673.50 | 681.00 |
| 8 | 682.00 | 694.00 | 703.00 | 712.00 |
| 9 | 709.00 | 723.50 | 734.00 | 745.00 |
| 10 | 737.00 | 753.50 | 766.50 | 779.00 |
| 11 | 766.00 | 785.50 | 800.00 | 815.00 |
| 12 | 796.50 | 818.50 | 835.00 | 852.50 |
| 13 | 828.00 | 853.00 | 872.00 | 891.50 |

## Finance Representative I

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 530.50 | 530.50 | 530.50 | 530.50 |
| 2 | 556.00 | 557.50 | 558.50 | 559.50 |
| 3 | 582.50 | 585.50 | 587.50 | 590.00 |
| 4 | 610.50 | 615.00 | 618.50 | 622.00 |
| 5 | 640.00 | 646.00 | 651.00 | 656.00 |
| 6 | 670.50 | 679.00 | 685.00 | 691.50 |
| 7 | 703.00 | 713.50 | 721.00 | 729.50 |
| 8 | 736.50 | 749.50 | 759.00 | 769.00 |
| 9 | 772.00 | 787.00 | 799.00 | 811.00 |
| 10 | 809.00 | 827.00 | 841.00 | 855.00 |
| 11 | 847.50 | 869.00 | 885.00 | 901.50 |
| 12 | 888.50 | 913.00 | 931.50 | 950.50 |
| 13 | 931.00 | 959.00 | 980.50 | 1002.50 |

## Finance Representative II

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 575.50 | 575.50 | 575.50 | 575.50 |
| 2 | 601.50 | 603.00 | 604.00 | 605.50 |
| 3 | 629.00 | 632.00 | 634.50 | 636.50 |
| 4 | 657.50 | 662.00 | 666.00 | 669.50 |
| 5 | 687.00 | 694.00 | 699.00 | 704.00 |
| 6 | 718.50 | 727.00 | 734.00 | 740.50 |
| 7 | 751.00 | 762.00 | 770.50 | 779.00 |
| 8 | 785.00 | 798.50 | 809.00 | 819.50 |
| 9 | 820.50 | 837.00 | 849.00 | 861.50 |
| 10 | 857.50 | 877.00 | 891.50 | 906.50 |
| 11 | 896.50 | 919.00 | 936.00 | 953.50 |
| 12 | 937.00 | 963.00 | 982.50 | 1002.50 |
| 13 | 979.50 | 1009.00 | 1031.50 | 1054.50 |

## Fraud Analyst

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 482.00 | 482.00 | 482.00 | 482.00 |
| 2 | 511.00 | 512.50 | 513.50 | 514.50 |
| 3 | 542.00 | 545.00 | 547.00 | 549.00 |
| 4 | 575.00 | 579.00 | 582.50 | 585.50 |
| 5 | 609.50 | 615.50 | 620.00 | 625.00 |
| 6 | 646.50 | 654.50 | 660.50 | 666.50 |
| 7 | 685.50 | 696.00 | 703.50 | 711.50 |
| 8 | 727.00 | 739.50 | 749.50 | 759.00 |
| 9 | 771.00 | 786.50 | 798.00 | 810.00 |
| 10 | 817.50 | 836.00 | 850.00 | 864.50 |
| 11 | 867.00 | 889.00 | 905.50 | 922.00 |
| 12 | 919.50 | 945.00 | 964.50 | 984.00 |
| 13 | 975.00 | 1004.50 | 1027.00 | 1050.00 |

## Information Systems Technician

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 576.50 | 576.50 | 576.50 | 576.50 |
| 2 | 615.50 | 617.00 | 618.50 | 619.50 |
| 3 | 657.50 | 661.00 | 663.50 | 666.00 |
| 4 | 702.50 | 707.50 | 711.50 | 715.50 |
| 5 | 750.00 | 757.50 | 763.00 | 769.00 |
| 6 | 801.00 | 811.00 | 818.50 | 826.00 |
| 7 | 855.50 | 868.50 | 878.00 | 888.00 |
| 8 | 914.00 | 929.50 | 942.00 | 954.00 |
| 9 | 976.00 | 995.50 | 1010.50 | 1025.50 |
| 10 | 1042.50 | 1066.00 | 1083.50 | 1102.00 |
| 11 | 1113.50 | 1141.00 | 1162.50 | 1184.00 |
| 12 | 1189.00 | 1221.50 | 1247.00 | 1272.50 |
| 13 | 1270.00 | 1308.00 | 1337.50 | 1367.50 |

## Retail Sales Consultant

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 375.50 | 423.50 | 423.50 | 423.50 |
| 2 | 396.00 | 445.50 | 446.50 | 447.00 |
| 3 | 417.00 | 468.50 | 470.50 | 472.00 |
| 4 | 440.00 | 493.00 | 495.50 | 498.50 |
| 5 | 463.50 | 518.50 | 522.50 | 526.00 |
| 6 | 488.50 | 545.50 | 550.50 | 555.50 |
| 7 | 515.00 | 573.50 | 580.00 | 586.50 |
| 8 | 543.00 | 603.50 | 611.50 | 619.50 |
| 9 | 572.50 | 634.50 | 644.00 | 654.00 |
| 10 | 603.00 | 667.50 | 679.00 | 690.50 |
| 11 | 636.00 | 702.50 | 715.50 | 729.00 |
| 12 | 670.50 | 738.50 | 754.00 | 769.50 |
| 13 | 706.50 | 777.00 | 794.50 | 812.50 |

## Sales Specialist

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 548.00 | 548.00 | 548.00 | 548.00 |
| 2 | 577.00 | 578.50 | 579.50 | 580.50 |
| 3 | 607.50 | 610.50 | 613.00 | 615.00 |
| 4 | 640.00 | 644.50 | 648.50 | 652.00 |
| 5 | 674.00 | 680.50 | 685.50 | 691.00 |
| 6 | 710.00 | 718.50 | 725.00 | 732.00 |
| 7 | 747.50 | 758.50 | 767.00 | 775.50 |
| 8 | 787.00 | 801.00 | 811.00 | 821.50 |
| 9 | 829.00 | 845.50 | 858.00 | 870.50 |
| 10 | 873.00 | 892.50 | 907.50 | 922.50 |
| 11 | 919.50 | 942.00 | 959.50 | 977.50 |
| 12 | 968.00 | 994.50 | 1015.00 | 1036.00 |
| 13 | 1019.50 | 1050.00 | 1073.50 | 1097.50 |

## Sales Support Representative

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 530.50 | 530.50 | 530.50 | 530.50 |
| 2 | 556.00 | 557.50 | 558.50 | 559.50 |
| 3 | 582.50 | 585.50 | 587.50 | 590.00 |
| 4 | 610.50 | 615.00 | 618.50 | 622.00 |
| 5 | 640.00 | 646.00 | 651.00 | 656.00 |
| 6 | 670.50 | 679.00 | 685.00 | 691.50 |
| 7 | 703.00 | 713.50 | 721.00 | 729.50 |
| 8 | 736.50 | 749.50 | 759.00 | 769.00 |
| 9 | 772.00 | 787.00 | 799.00 | 811.00 |
| 10 | 809.00 | 827.00 | 841.00 | 855.00 |
| 11 | 847.50 | 869.00 | 885.00 | 901.50 |
| 12 | 888.50 | 913.00 | 931.50 | 950.50 |
| 13 | 931.00 | 959.00 | 980.50 | 1002.50 |

## Service Technician

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 504.00 | 504.00 | 504.00 | 504.00 |
| 2 | 540.00 | 541.50 | 542.50 | 543.50 |
| 3 | 578.50 | 581.50 | 583.50 | 585.50 |
| 4 | 620.00 | 624.50 | 628.00 | 631.50 |
| 5 | 664.00 | 670.50 | 675.50 | 680.50 |
| 6 | 711.50 | 720.50 | 727.00 | 734.00 |
| 7 | 762.50 | 773.50 | 782.00 | 791.00 |
| 8 | 816.50 | 831.00 | 841.50 | 852.50 |
| 9 | 875.00 | 892.50 | 905.50 | 919.50 |
| 10 | 937.50 | 958.50 | 974.50 | 991.00 |
| 11 | 1004.50 | 1029.50 | 1048.50 | 1068.50 |
| 12 | 1076.00 | 1105.50 | 1128.00 | 1151.50 |
| 13 | 1153.00 | 1187.50 | 1214.00 | 1241.50 |

## Small Biz Advisor I

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 521.50 | 521.50 | 521.50 | 521.50 |
| 2 | 541.00 | 542.50 | 543.50 | 544.50 |
| 3 | 561.50 | 564.00 | 566.00 | 568.50 |
| 4 | 582.50 | 586.50 | 590.00 | 593.50 |
| 5 | 604.00 | 610.00 | 615.00 | 619.50 |
| 6 | 627.00 | 634.50 | 640.50 | 646.50 |
| 7 | 650.50 | 660.00 | 667.50 | 675.00 |
| 8 | 674.50 | 686.50 | 695.50 | 704.50 |
| 9 | 700.00 | 714.00 | 725.00 | 735.50 |
| 10 | 726.00 | 742.50 | 755.50 | 768.00 |
| 11 | 753.50 | 772.50 | 787.00 | 801.50 |
| 12 | 781.50 | 803.50 | 820.00 | 836.50 |
| 13 | 811.00 | 835.50 | 854.50 | 873.50 |

## Technical MSC/RNOC

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 720.00 | 720.00 | 720.00 | 720.00 |
| 2 | 769.50 | 771.50 | 773.00 | 774.00 |
| 3 | 822.50 | 826.50 | 829.50 | 832.50 |
| 4 | 878.50 | 885.50 | 890.00 | 895.00 |
| 5 | 939.00 | 948.50 | 955.50 | 962.50 |
| 6 | 1003.50 | 1016.00 | 1025.50 | 1035.00 |
| 7 | 1072.50 | 1088.50 | 1100.50 | 1113.00 |
| 8 | 1146.00 | 1166.00 | 1181.50 | 1197.00 |
| 9 | 1225.00 | 1249.00 | 1268.00 | 1287.00 |
| 10 | 1309.00 | 1338.50 | 1361.00 | 1384.00 |
| 11 | 1399.00 | 1433.50 | 1460.50 | 1488.00 |
| 12 | 1495.00 | 1536.00 | 1567.50 | 1600.00 |
| 13 | 1597.50 | 1645.50 | 1682.50 | 1720.50 |

## Telesales Representative

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 439.00 | 439.00 | 439.00 | 439.00 |
| 2 | 460.00 | 461.00 | 462.00 | 462.50 |
| 3 | 481.50 | 484.00 | 486.00 | 487.50 |
| 4 | 504.50 | 508.50 | 511.00 | 514.00 |
| 5 | 528.50 | 533.50 | 538.00 | 541.50 |
| 6 | 553.50 | 560.50 | 566.00 | 571.00 |
| 7 | 580.00 | 588.50 | 595.00 | 602.00 |
| 8 | 607.50 | 618.00 | 626.00 | 634.50 |
| 9 | 636.50 | 649.00 | 659.00 | 668.50 |
| 10 | 666.50 | 681.50 | 693.00 | 704.50 |
| 11 | 698.00 | 715.50 | 729.00 | 742.50 |
| 12 | 731.50 | 751.50 | 767.00 | 782.50 |
| 13 | 766.00 | 789.00 | 807.00 | 825.00 |

**Wireless Technician**

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 720.00 | 720.00 | 720.00 | 720.00 |
| 2 | 769.50 | 771.50 | 773.00 | 774.00 |
| 3 | 822.50 | 826.50 | 829.50 | 832.50 |
| 4 | 878.50 | 885.50 | 890.00 | 895.00 |
| 5 | 939.00 | 948.50 | 955.50 | 962.50 |
| 6 | 1003.50 | 1016.00 | 1025.50 | 1035.00 |
| 7 | 1072.50 | 1088.50 | 1100.50 | 1113.00 |
| 8 | 1146.00 | 1166.00 | 1181.50 | 1197.00 |
| 9 | 1225.00 | 1249.00 | 1268.00 | 1287.00 |
| 10 | 1309.00 | 1338.50 | 1361.00 | 1384.00 |
| 11 | 1399.00 | 1433.50 | 1460.50 | 1488.00 |
| 12 | 1495.00 | 1536.00 | 1567.50 | 1600.00 |
| 13 | 1597.50 | 1645.50 | 1682.50 | 1720.50 |

**Work Force Administrator**

| Step | Effective 02/12/17 | Effective 02/11/18 | Effective 02/10/19 | Effective 2/09/20 |
|---|---|---|---|---|
| 1 | 419.00 | 419.00 | 419.00 | 419.00 |
| 2 | 440.50 | 441.50 | 442.50 | 443.50 |
| 3 | 463.50 | 465.50 | 467.50 | 469.00 |
| 4 | 487.50 | 491.00 | 494.00 | 496.50 |
| 5 | 512.50 | 517.50 | 521.50 | 525.50 |
| 6 | 539.00 | 545.50 | 551.00 | 556.00 |
| 7 | 567.00 | 575.50 | 582.00 | 588.50 |
| 8 | 596.00 | 606.50 | 614.50 | 622.50 |
| 9 | 627.00 | 639.50 | 649.00 | 659.00 |
| 10 | 659.50 | 674.00 | 685.50 | 697.00 |
| 11 | 693.50 | 711.00 | 724.00 | 737.50 |
| 12 | 729.50 | 749.50 | 765.00 | 780.50 |
| 13 | 767.00 | 790.00 | 808.00 | 826.00 |

## MEMORANDUM OF AGREEMENT
## CWA INTERNAL APPEAL PROCESS

This Memorandum of Agreement between Communications Workers of America (the Union) and AT&T Mobility **Services** LLC and **AT&T Customer Services, Inc.** (**collectively** the Company) is effective upon ratification of the **2017** Labor Agreement between the parties and shall be effective for the life of such agreement.

1. Whenever the Union, during the term of this trial, notifies the Company in writing of its election to arbitrate a grievance pursuant to Article 9, Arbitration, of the applicable Labor Agreement, and in the same writing also notifies the Company: (1) that the election to arbitrate is involved in the Union's internal appeal process, and (2) that the notice of election to arbitrate is therefore being given solely to preserve the Union's right to arbitrate in the event that the appeal is upheld, the parties agree that the running of the 60 day time limit provided for in Section 2. of said Article 9 shall be frozen as of the date the Company receives said notice.

2. With respect to any grievance as to which notice is given to the Company in accordance with the terms of Paragraph 1., above, the Union shall notify the Company promptly in writing of the outcome of its internal appeal process, and at the same time:

    a. If the appeal is upheld, the Union shall also notify the Company of its intent to proceed to arbitration, and the running of the 60 day time limit provided for in Section 2. of Article 9, Arbitration, of the applicable Labor Agreement, shall resume as of the date upon which the Company receives this notice.

    b. If the appeal is denied, the Union shall also notify the Company of withdrawal of its previous notice of election to arbitrate the subject grievance.

COMMUNICATIONS WORKERS OF AMERICA

AT&T MOBILITY LLC
AT&T CUSTOMER SERVICES, INC.

By: _Patricia M Telesco_

By: _Brian Cattaneo_

Pat Telesco
CWA Area Director, District 1
Communications Workers of America

Brian Cattaneo
Lead Labor Relations Manager
AT&T

MEMORANDUM OF AGREEMENT
FOR
PAYROLL DEDUCTION OF CWA–COPE

This is an agreement between AT&T Mobility **Services** LLC and **AT&T Customer Services, Inc. (collectively, the** "Company") and Communications Workers of America, ("Union") by which the Company agrees, effective upon ratification of the **2017** Labor Agreement between the parties and for the life of the **2017** Labor Agreement, to provide a procedure whereby eligible employees of the Company may make voluntary contributions through payroll deduction to CWA-COPE, a separately segregated Political Action Committee (PAC) sponsored by the Union. The terms of the agreement are:

1. Eligibility to participate in contributions to CWA-COPE is restricted to those employees of the Company who are certified by the Union as eligible under applicable federal and state laws. Participation by eligible employees shall be on a voluntary basis and employees shall be so informed by the person soliciting their participation on behalf of the Union.

2. Deductions from employees' pay shall be made each pay period and will begin or change in the first pay period ending in the month following receipt of a signed payroll deduction authorization (PRD) card. Authorization cards are to be forwarded to the payroll office by the 20th calendar day of a month in order for them to be effective in the month following receipt. Deductions shall be in the minimum amount of 25 cents per pay period. The employees' paydrafts will carry an indication of the PAC deduction.

3. The Company will remit contributions to the Treasurer, CWA-COPE Political Contributions Committee, monthly, following the deduction from the employees' pay. In addition, the Company will transmit monthly a list of contributors through payroll deductions showing the contributors' names and amounts contributed.

4. Any employee's payroll deduction shall cease only upon the occurrence of any of the following:
   a. Termination of a participating employee's employment with the Company.
   b. Retirement of a participating employee.
   c. Transfer of a participating employee out of the bargaining unit.
   d. Receipt in the payroll office of written notice to cancel contributions to CWA-COPE signed by the employee.

5. The Union shall reimburse the Company for all costs and expenses incurred in implementing and maintaining this payroll deduction program which shall include, but not be limited to, the initial costs of establishing same, the processing of authorization of deductions and remittances, and preparation of any reports to the Union or filed with governmental or regulatory bodies, and

any increase in such costs and expenses. Upon determination of its initial costs to establish and implement the program, the Company will render a bill to the Union for the total amount which shall be due and payable within ninety (90) days thereafter. The Company will bill the Union monthly for the costs of maintaining the program including the processing of authorization cards, handling the periodic deductions and remittances, fulfilling any reporting requirements, and any other costs incurred. Payment of monthly bills will be due thirty (30) days after rendition by the Company.

6. This agreement is subject to applicable federal, state and local laws and regulations and shall not be effective where prohibited by any such laws or regulations.

7. The parties agree the Company assumes no responsibility under this agreement other than the collection of contributions pursuant to employee authorization of payroll deductions and forwarding of such amounts collected to CWA-PAC. The Union agrees to indemnify the Company and hold it harmless from all claims, damages, costs and expenses of any kind which may arise in connection with the program covered by this agreement.

COMMUNICATIONS WORKERS OF AMERICA

AT&T MOBILITY SERVICES LLC
AT&T CUSTOMER SERVICES, INC.

By: *Patricia M Telesco*

Patricia M. Telesco
CWA Area Director District 1
Communications Workers of America

By: *Brian Cattaneo*

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**                          LOA 1 – Personnel Records Review

February 12, 2017


Ms. Patricia M. Telesco
Area Director
193 State Street
2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

1. Upon written request, an employee shall be permitted to examine and make copies of records containing personally identifiable employee information about themselves pursuant to and in accordance with the Company's then current policies and procedures relating to that subject.

2. The Company shall provide an employee with each written notice of disciplinary action within a reasonable period.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**                              LOA 2 – Designated Union Representative

February 12, 2017

Ms. Patricia M. Telesco
Area Director
193 State Street
2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

Subject to ratification of the **2017** Labor Agreement the Company agrees to make the Director-Labor Relations available to work with a designated representative of the Union for the purpose of developing a joint presentation for employee orientation meetings, as outlined in Section 1., of Article 17, Company-Union Relationship. It is further the Company's intent to allow the Union representative to remain at the Company facility at the conclusion of the orientation meeting to meet privately with any Bargaining Unit employees who elect to remain for additional information and/or questions.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**                                   LOA 3 – Training Course Assignment

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

Subject to ratification of the **2017** Labor Agreement between the Communications Workers of America and AT&T Mobility **Services** LLC and **AT&T Customer Services, Inc.**, the Company agrees that prior to assigning an employee to a formal training course; it will consider the employee's seniority as well as the employee's performance, capabilities, and other such relevant factors.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

Subject to ratification of the **2017** Labor Agreement between AT&T Mobility **Services** LLC, **AT&T Customer Services, Inc.**, and the Communications Workers of America it is the Company's intent in the administration of Section 2. of Article 19, Basis of Compensation, of the **2017** Labor Agreement, to limit changes in annual sales commission plans to those required for competitive or business reasons as determined by the Company. While the highly competitive and dynamic nature of the Company's business does not allow the Company to commit to a limitation in sales commission changes, it is the Company's intent that any changes to sales commissions will be made in a manner that fairly recognizes both the contribution of the employees and the desire of the Company to outperform its competitors. In this regard, it is further the Company's intent to provide, whenever practicable, at least one (1) week's advance notice to the CWA prior to its notice to employees related to any such changes.

The Company agrees to establish a joint committee to meet twice a year, or more/less frequently if needed and mutually agreed to by the committee chairs, to discuss suggestions regarding additional compensation plans, commissions, bonuses, incentive programs and performance management programs associated with retail sales (currently RSSM). This committee will consist of no more than four representatives each. The union committee will consist of 3 employees and 1 representative from the CWA International. The meeting place and time will be mutually agreeable by the committee chairs. Meeting expenses will be paid by the company. Normal meeting time should consist of one-day sessions not requiring an overnight stay. Participants will only be paid for a normal shift.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**

LOA 5 – Subcontracting

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

Subject to ratification of the **2017** Labor Agreement between AT&T Mobility **Services** LLC, **AT&T Customer Services, Inc.**, and the Communications Workers of America it is the Company's intent in administering the provisions of Article 2, Recognition and Establishment of the Unit, Section 2, related to the subcontracting of work, to consider the interest of customers and employees as well as the needs of the Company in its highly competitive and dynamic business. For various reasons including, but not limited to, law, regulations, changing industry structure, economic and competitive conditions, and business considerations, it is not possible for the Company to make specific commitments on contracting out of work. However, it is the Company's general policy that traditional wireless work will not be contracted out if it will currently and directly cause layoffs or part-timing of regular employees in the bargaining unit. It is the general policy of the Company:

- to have employees within the bargaining unit perform bargaining unit work;

- to provide notice to the Union when contracting, except as noted above, is anticipated to last more than ninety (90) days, and to discuss the reasons for such contracting;

- to consider the use of Union-represented contractors to perform work normally performed by the bargaining unit with the understanding that the selection of any contractor is determined solely by the Company; and

- to generally use contractors for reasons associated with force or technological requirements or to operate specialized equipment and/or systems.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**                                                    LOA 6 – Four Day Tour

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

Subject to ratification of the **2017** Labor Agreement between AT&T Mobility **Services** LLC, **AT&T Customer Services, Inc.,** and the Communications Workers of America it is the Company's intent to recognize that in certain work groups it may be beneficial to the employees and in the best interest of the business to establish a four day schedule as a normal tour. Accordingly, in a work group where management and the union agree, the number of hours which presently constitute a normal five day tour will be scheduled in equal amounts over four days.

The work groups selected for such four day tours will be solely at the discretion of the Company. The management and the union will discuss the process by which the number of employees who volunteer will be assigned their shifts and tours. It is further agreed that if the needs of the business require the Company to discontinue the four day tour, the Company will notify the Union in advance.

Four day tours will be scheduled in advance as full tours. No daily overtime payment shall be made for any of the scheduled hours worked which constitute the normal four day tour.

Subject to the above, and before implementing a four day schedule in any work group, management and the union will establish the parameters and implementation procedures for such four day tours. Unless otherwise agreed, the following will apply:

1) Weeks in which holidays fall will revert to a normal five day tour.

2) Employees scheduled for a week of vacation will have their tours revert to the normal five day tour.

3) Employees pre-scheduled for Excused Work Days, Day-At-A-Time Vacation, Floating Holiday(s), or jury duty will revert their tours to the normal five day tour. Non-scheduled Floating Holidays, Excused Work Days, or Day-At-A-Time Vacation within a week in which the employee's tour is four ten hour days will be treated as ten hour days. Employees may take no more than four ten hour unscheduled days (i.e., forty hours) on a day-at-a-time basis.

These unscheduled days include Floating Holidays, Excused Work Days, or Vacation days.

4) Payment will be based upon a ten hour day for employees who are absent because of sickness or accident disability during the course of the four day tour. If the disability continues into the next week, the employee's tour will revert to the normal five day tour.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**

LOA 7 – Neutral Evaluations

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

Subject to ratification of the **2017** Labor Agreement between AT&T Mobility **Services LLC**, **AT&T Customer Services, Inc.**, and the Communications Workers of America as soon as reasonable, following ratification of this agreement, a CWA International Representative and a Labor Relations representative will meet and agree upon ten (10) neutral evaluators ("evaluators") to create a special panel for purposes of this process. The parties will schedule neutral evaluation days with each evaluator, where the evaluator will hear no more than four (4) dismissal and/or suspension cases per day. Each case will be limited to ninety (90) minutes as set forth below. The cases will be evenly distributed among the evaluators as practicality permits. The parties agree to equally share the compensation and expenses of the neutral evaluations.

Proceedings before the evaluator shall be informal in nature. The presentation of evidence and the issues heard will be limited to that which has already been presented or asserted during the grievance procedure. Formal rules of evidence will not apply. The parties will be represented by Labor Relations Managers and Union Representatives and no official record of the neutral evaluation will be kept.

Each party may have no more than two (2) individuals attend the neutral evaluation proceeding. Each party will be limited to a half hour presentation. The evaluator will be provided one half hour to question both parties in the presence of one another, and to render his or her advisory opinion. This advisory opinion will resolve any procedural or arbitrarily issues and/or determine whether the Company acted with or without just cause, and where the disciplinary action lacked just cause, what if any, remedy should be imposed.

Within two (2) working days following the evaluator's advisory opinion, a party must notify the other party in writing if the party rejects the evaluator's advisory opinion; otherwise it will be treated as accepted by the party. In instances where the parties accept the evaluator's advisory opinion of no just cause, the Company agrees to implement the remedy within ten (10) working days. In instances where the parties accept the evaluator's advisory opinion of just cause, the Union agrees to withdraw the grievance in writing within ten (10) working days.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

Subject to ratification of the **2017** Labor Agreement between AT&T Mobility **Services** LLC, **AT&T Customer Services, Inc.** and the Communications Workers of America the Company and the Union acknowledge their mutual interest in minimizing the hardships placed on the employees around work and family issues. It is therefore agreed that no later than ninety (90) days after ratification of this Agreement, two (2) representatives from the Union and two (2) representatives from the Company will meet together to explore options that are mutually agreeable that could alleviate some of these hardships. Options explored could include, but are not limited to establishment of a Dependent Care Fund, Kids in the Workplace programs, and discounted rates at certified sites.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**

LOA 9 – Innovative Scheduling

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

Subject to ratification of the **2017** Labor Agreement between AT&T Mobility **Services** LLC, **AT&T Customer Services, Inc.**, and the Communications Workers of America the Company will encourage innovative scheduling in those organizations that determine such scheduling permits them to meet the needs of the business. Such scheduling shall be in accordance with those provisions of the **2017** Agreement between the Union and the Company governing scheduling. Both the Company and the Union will encourage the active involvement of Local Union Officers in "Innovative Scheduling" implementation efforts.

It is further understood that if such scheduling does not prove to be in the best interest of the business, it will be discontinued effective with one (1) week's notice to the employees involved.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**                                              LOA 10 – Motor Vehicle Policy

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

Subject to ratification of the **2017** Labor Agreement, the Company will continue the existing Motor Vehicle Usage Policy.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**                                              LOA 11 – Sales Quota

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

Subject to ratification of the **2017** Labor Agreement between AT&T Mobility **Services** LLC, **AT&T Customer Services, Inc.**, and the Communication Workers of America, monthly sales quotas for Retail Sales Consultants will be adjusted in eight hour increments (8 aggregate hours in a calendar month) for Vacation, EWP, Company mandated training, and Union absence time.   Monthly sales quotas for discipline purposes will be adjusted in 8 hour increments (8 aggregate hours in a calendar month) for Vacation Company mandated training, and Union absence time.

Accelerator payments will be based on the targeted number at 100% for the month using the following examples:

- *If the monthly new quota is 40 units and the month has four weeks in it, each 8-hr day is equal to 2 units.  If an employee takes a total of 8 hours off for vacation or mandated training, they will be given credit for 2 sales in the system. If their net sales (after chargebacks are applied) for the remaining days of the month are 38, they would be at 100% of their assigned goal (38+2=40. 40/40=100%).*

- *In the same example above, if the employees' net sales were 40 units then they would be at 105% to goal (40+2=42. 42/40=105%).*

- *In the example above, if the employee had 46 net sales in the remaining days of the month, they would be at 120% to assigned goal (46+2=48.  48/40=120%).*

Inside Sales/Retail Sales Consultants will be allowed to match AT&T Mobility consumer internet prices for identical equipment, accessories, and services when requested by the customer and approved by management.   Management will reasonably consider the requests when they are made by the representative.

Chargebacks that are more than 91 days old will not count against quota attainment for discipline purposes.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**                                    LOA 12 – Quality Observations

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

Subject to ratification of the **2017** Labor Agreement between AT&T Mobility **Services** LLC, **AT&T Customer Services, Inc.,** and the Communications Workers of America, the Company and the Union acknowledge that there is a responsibility to provide high quality service to customers and the need to be in a position to effectively compete in today's increasingly competitive wireless industry. Call Quality Observation and Sales Floor Observation are tools to evaluate the effectiveness of employees to reach and maintain quality service, and to continually develop employees' skills to provide high quality service, as well as to expand personal growth. The approach for monitoring will continue to be based on a premise that fosters a work environment that builds on mutual trust and respect which enhances job satisfaction.

In addition, to ensure courteous treatment, accurate information, and superior service, customer calls may be observed and Sales Floor Observations may be performed for many productive purposes such as, but not limited to, assisting in the training and development of employees, identification of customer needs, and product evaluation.

**The following language applies to employees in call centers:**

- **A maximum of eight (8) randomly selected customer call per representative per month may be observed. Management shall select the first call to be observed and will alternate selection with the employee for all calls thereafter. Calls selected by the employee must have a minimum duration of three (3) minutes or more. Management will determine the method of evaluation.**

- **Additional customer calls selected for coaching purposes will not be used toward discipline except in the event of misconduct.**

**The following language applies to employees in Retail locations:**

- **A maximum of six (6), full or partial, customer interactions may be observed per month. Management will determine the method of evaluation and what is observed.**

- **An interaction is defined as one made by a member of management on the retail floor.**

The Company and Union recognize that discussions concerning performance are most effective when communicated in a reasonably close timeframe to the observation.  To this end, the Company will generally review with the employee the Call Quality Observation and Sales Floor Observation results within the employee's next two (2) scheduled work days following the quality observation.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

The Company will provide prescription safety glasses to the Wireless Technicians and Technical – MSC/RNOCs (collectively "Technicians") and **Supply Chain employees** who are required by the Company's Environmental Health & Safety policies to wear safety glasses because of the work duties they perform and whose eyesight requires that they use prescription eyewear as follows:

- Technicians **and Supply Chain employees** whose duties only require them to wear safety glasses indoors will be provided one (1) pair of clear lens prescription safety glasses; or

- Technicians **and Supply Chain employees** whose duties require them to wear safety glasses outdoors will be provided one (1) pair of clear lens and one (1) pair of dark lens or one (1) pair of photocromatic (photogrey) lens prescription safety glasses.

The prescription safety glasses will be provided from a pre-established list as determined by the Company. The Company will determine the process under which the prescription safety glasses will be provided.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**                    LOA 14 – Climbing boots**\Safety Footwear**

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

The Company will provide the Wireless Technicians who are required by the
Company's Environmental Health & Safety (EH&S) policies to wear climbing boots
because of the work duties they perform **and Supply Chain employees who are
required by the Company's EH&S policies to wear safety footwear because
of the work duties they perform** not more than one (1) pair of climbing boots **or
safety footwear** per calendar year from a pre-established list as determined by
the Company.  The Company will determine the process under which the climbing
boots **or safety footwear** will be provided.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

The Company and the Union recognize that significant benefits have been and will continue to be derived from cooperative Union-Management relations.  Through such Cooperation, the parties have been able to explore innovative methods of operation which seek to modify traditional workplace relationships in ways designed to enhance the Company's effectiveness and competitiveness, increase Union and employee participation in local workplace decisions, and maximize employee satisfaction with their work.

Subject to the ratification of the **2017** Labor Agreement between AT&T Mobility **Services** LLC, **AT&T Customer Services, Inc.,** and the Communications Workers of America, a renewed emphasis will be placed on the Working Relations Committee Meetings.  The intent of these meetings is to allow broad concerns of mutual interest to be discussed and resolved at a local level.  Also, during negotiations for the **2017** Labor Agreement, the Union and the Company discussed the Company's continued use of contractors.  As a result of those discussions, the Company and the Union agreed that a good forum for such conversations is the current Strategic Alliance Committee.

Furthermore, in the spirit of the Company-Union partnership and in an effort to further strengthen frequent and open communication, AT&T Mobility and all Districts of the Communications Workers of America (CWA) included in the **2017** Labor Agreement, agree to continue the Strategic Alliance Committee for the duration of the **2017** contract.

The Strategic Alliance Committee will have three primary objectives:

1.  To strengthen the company's competitive position in the marketplace;
2.  Provide a forum for Company and Union leadership to discuss various issues with leaders of the business, such as improving employee attendance, growth opportunities for employees, the Company's continued use of contractors, the Company-Union relationship, improving the customer experience, etc.; and,
3.  To discuss and trial creative and innovative labor relations approaches to complex challenges in this competitive market.

The Strategic Alliance Committee structure will be as follows:

1. The Strategic Alliance Committee will be comprised of one (1) Representative from each CWA District represented in the Labor Agreement and an equal number of company representatives, plus a chairperson for each side. Company representatives may consist of regional leadership from functional areas such as Customer Service, Company Owned Retail Operations, Network, Labor Relations and Human Resources. Appointments of specific individual participants will be determined by the Company and the Union for themselves.

2. The Strategic Alliance Committee will meet up to three times annually but may be convened more frequently upon mutual agreement of the parties.

3. As appropriate and when mutually agreed to, the Strategic Alliance Committee may establish ongoing joint committees, ad hoc committees, etc. for the purpose of addressing specific areas for review and recommendation as directed by the Strategic Alliance Committee.

4. Recommendations of committees jointly established in number 3 above, if any are mutually agreed upon, will be submitted to the Strategic Alliance Committee for consideration.

Nothing in this Letter of Agreement shall release or change the duties and rights of either party as provided in their 2013 Labor Agreement or change or increase the parties' existing duties to provide relevant, requested information to each other.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

The Company agrees during the period of this Letter of Agreement:

- Upon 100% achievement of performance targets, full time Retail Sales Consultants ("RSC's") will be targeted to earn a minimum pre-chargeback "at-risk" commission of **$10,250** per year.

- All components of the Compensation Plan are determined and remain at the sole discretion of the Company including but not limited to compensation components (e.g. what activities and measures are subject to compensation, volumes required, establishment of performance targets and target minimums), qualifiers (e.g. minimum standards that must be met in order to be eligible for commissions, division of dollars associated with each compensated element, seasonally impact on target setting, and new hire expectations).

- The Company reserves in its sole discretion the right to trial, test, and introduce new compensation practices, elements, components, programs, and plans subject to the minimum pre-chargeback "at-risk" commission set forth above.  RSC's on new hire guarantee are exempt.  This letter does not replace, relieve, or diminish any right to impose or set quota requirement(s) as the Company deems appropriate.

Sincerely,

Brian Cattaneo
Lead Labor Relations Manager
AT&T

 **AT&T**

LOA 17 – Network Technicians

February 12, 2017

Ms. Patricia M. Telesco
CWA Area Director
193 State Street 2nd Floor
North Haven, CT 06473

Dear Ms. Telesco:

In the event the Company determines that a temporary workforce imbalance exists for Wireless Technicians in a specified area, the Company will notify the Union Local(s) in that area.  For purposes of satisfying the temporary workforce imbalance, the Company will first seek volunteers from the affected Wireless Technicians, as determined by management, in seniority order. If an insufficient number of employees volunteer, then the Company will assign by inverse seniority.  The Company shall determine the location(s)/orbit(s) from which the reassignment will occur.  If the temporary workforce imbalance continues for six (6) months, the imbalance will be remedied by making a permanent rearrangement of the workforce as described below.

In the event the Company determines a permanent rearrangement of the Wireless Technician workforce becomes necessary due to a workforce imbalance, the Company will advise the CWA Local(s) representing affected employees prior to notification of the employees. The Company will endeavor to notify affected employees thirty (30) days prior to the effective date of their reassignment. The Company shall determine the location(s)/orbit(s) from which the reassignment will occur.

In making this determination the Company will first seek volunteers from the affected Wireless Technicians, as determined by management, in seniority order. If an insufficient number of employees volunteer, then the Company will assign by inverse seniority.  The Company will notify the Union with the results of the canvas before completing a permanent rearrangement.

If an employee is reassigned, voluntarily or involuntarily, through this process and an assignment becomes available within one (1) year in the orbit(s) from which the technician was previously assigned, the employee shall have the opportunity to retreat to the previously assigned location/orbit.  An employee rejecting an initial opportunity to retreat will forfeit all return rights under this section.

Sincerely,

*Brian Cattaneo*

Brian Cattaneo
Lead Labor Relations Manager
AT&T

Bill Bates
National Telecomm Director
Communications Workers of America

The Company plans to pilot a new Retail Scheduling Tool.  The COR Retail Scheduling Tool is designed to unite all regions under a complete set of guiding scheduling principles and implement a comprehensive  set of business rules for schedule creation and maintenance.  We expect testing and reviewing of the proposed configuration in 1Q09.  This test will ensure the configuration elements are providing realistic and usable schedules for employees.  Ten locations in the Orange contract have been selected representing a sample of the full spectrum of COR locations based on traffic and headcount.  Those locations will be clustered in the regions shown below:

| LOCATION ID | LOCATION NAME | REGION |
|---|---|---|
| CA0382 | Santa Clara | West |
| CA0009 | Saratoga | West |
| CA0316 | Folsom | West |
| CA0303 | Creekside | West |
| MN0008 | Riverdale Commons | North Central |
| MN0014 | Southdale Center | North Central |
| MN0027 | Burnsville | North Central |
| NJ0068 | Garden State Plaza | North East |
| NJ0086 | Linwood Plaza | North East |
| NJ0092 | Paramus Route 4 West | North East |

User acceptance testing will commence live on 3/02/09 and is expected to run for a period of two months.  Upon completion of the trial, the Company will evaluate the trial and determine next steps.

Sincerely,

Franklin Garon Jr.
Lead Labor Relations Manager
AT&T Services, Inc.

**AT&T**

February 12, 2017

Ms. Patricia M. Telesco
Area Director
193 State Street
2nd Floor
North Haven, CT 06473

**Re: Terms of Transfer Applicable to Employees Transferring between the Attached AT&T Participating Companies and AT&T Mobility Services LLC and AT&T Customer Services, Inc. into and out of the Mobility Bargaining Unit Represented by the Communication Workers of America Districts 1, 2-13, 4, 7, and 9.**

Dear Ms. Telesco:

This letter sets forth the terms of the agreement between AT&T Mobility **Services** LLC and **AT&T Customer Services, Inc.** ("AT&T Mobility") and Communications Workers of America ("CWA") regarding the terms of transfer applicable to CWA-represented employees transferring between the attached list of "AT&T Participating Companies"[1] (Attachment A) and AT&T Mobility into and out of the bargaining unit represented by the CWA Districts 1, 2-13, 4, 7, and 9 ("Agreement"). As each of the collective bargaining agreements for the West, Midwest, East, Legacy T, Southeast (including the BellSouth Telecommunications Contract, the Utility Operations Contract, the AT&T Billing Southeast Contract, the National Directory and Customer Assistance Contract and the BellSouth Internet Services Contract), Southwest and National Internet Contract (collectively the "Covered CBAs") with the CWA are ratified, the represented employees covered by each of the Covered CBAs employed by the AT&T Participating Companies set forth in Attachment A will be allowed to voluntarily transfer into vacancies at AT&T Mobility within the bargaining unit currently represented by CWA Districts 1, 2-13, 4, 7, and 9 (the "Mobility Unit"), under the terms and conditions set forth in this Agreement. For purposes of this Agreement, these employees are referred to as "Transferees". The terms of the National Transfer Plans ("NTP") as ratified in each of the Covered CBAs will apply[2] to the transfer process for Transferees moving between each of the AT&T Participating Companies and the Mobility Unit except as set forth below:

1. **Amendment for Transferees Coming into the Mobility Unit**

In lieu of Paragraph 2 of the Intersubsidiary Movement ("IMF") Section and Paragraphs 2 and 3 of the CWA Surplus Exchange ("CSE") Section of each NTP, Transferees interested in being considered for

---

[1] The term "Participating Companies" refers to wholly-owned subsidiaries of AT&T, Inc. as long as they remain wholly-owned subsidiaries.

[2] Any changes, modifications, or amendments to any NTP after the date of this letter that affect any terms and conditions concerning how AT&T Mobility receives Transferees will not become effective until such changes are agreed to in a new written agreement executed by the appropriate bargaining representatives of the Parties.

vacancies in the Mobility Unit will be considered after first consideration is afforded to qualified employees laid off from the AT&T Mobility bargaining unit and then internal AT&T Mobility bargained personnel in accordance with the **2017** AT&T Mobility/CWA Districts 1, 2-13, 4, 7, and 9 Labor Agreement ("**2017** Mobility Labor Agreement").  Transferees who are qualified for the particular vacancy will receive priority placement prior to off-street applicants who, in the judgment of the Company, are similarly qualified.  Otherwise, the terms of the **2017** Mobility Labor Agreement will control.  The applicant whom the Company deems most qualified will be selected.   If an AT&T Mobility bargained employee and a Transferee both have qualifications that, in the judgment of the Company, are relatively equal, the AT&T Mobility bargained employee will be selected for the vacancy.  Unless otherwise stated in this Agreement, when a Transferee is selected for a position covered by the **2017** Mobility Labor Agreement, he/she will be transferred using the same processes that are currently applicable to AT&T Mobility bargained personnel who transfer between AT&T Mobility jobs.

In lieu of Paragraphs 5 and 7 of the IMF Section and Paragraphs 8 and 10 of the CSE Section of each NTP, Transferees transferred on or after the effective date of this Agreement will be treated as newly hired as of the date of such transfer with respect to all benefit plans, programs and/or policies at AT&T Mobility pursuant to the terms and conditions of the plans, programs and/or policies, including subsequent changes made to such plans, programs and/or policies applicable to Mobility Unit employees in effect on the Transferees' transfer date, except as follows:

If a Transferee has satisfied the eligibility conditions for post-employment medical benefits under his/her applicable Covered CBA at the time of transfer to AT&T Mobility and transfers into the Mobility Unit during the term of his/her applicable Covered CBA ("Eligible Transferee"), when the Eligible Transferee terminates employment from AT&T Mobility, he/she would then be eligible to receive medical and voluntary benefits to the same extent as active employees of AT&T Mobility eligible for such benefits following the Eligible Transferee's termination through the term of the existing plan of benefits provided under the Mobility National Bargained Benefit Plan ("NBBP").  Once the applicable plan of benefits under the NBBP expires, such Eligible Transferee's post-employment benefits and eligibility would be subject to the same terms provided to Current Retirees[3] participating in the plan applicable to the bargaining unit from which he/she transferred.  Such benefits and eligibility for Current Retirees and all such Eligible Transferees may change from time to time as determined at the discretion of the Companies.[4]

2. **Clarification for Transferees Coming into the Mobility Unit**

---

[3] For purposes of this Agreement, "Current Retiree" means a former employee of an AT&T Participating Company who terminated employment with eligibility for post-employment benefits prior to the effective date of the collective bargaining agreement in effect for employees of the AT&T Participating Company as of the date of the Eligible Transferee's termination from AT&T Mobility.

[4] The Union acknowledges and expressly agrees that this Agreement does not create any obligation for AT&T Mobility or any of the other AT&T Participating Companies to negotiate over benefits for any Current Retirees.

Paragraph 3 of the IMF Section and Paragraph 4 of the CSE Section of the NTP govern how equally qualified Transferees competing against each other for the same vacancy within the Mobility Unit will be selected. If, however, an AT&T Mobility bargained employee and a Transferee both have qualifications that, in the judgment of the Company, are relatively equal, the AT&T Mobility bargained employee will be selected for the vacancy.

As a result of Paragraph 6 of the IMF Section and Paragraph 9 of the CSE Section of the NTP, a Transferee's Net Credited Service from the departing company will also be recognized within the Mobility Unit under the following contractual provisions in the **2017** Mobility Labor Agreement:

Article 3, Definitions of Employees

Article 7, Grievance Procedure

Article 9, Arbitration

Article 11, Seniority

Article 12, Hours of Work

Article 13, Work Assignments

Article 14, Force Adjustment

Article 21, Absences

Article 22, Vacations

Article 23, Holidays

Article 24, Excused Days With Pay

Under the Order of Consideration provision, Transferees will have the order of consideration set forth in the National Transfer Plans, but if an AT&T Mobility bargained employee and a Transferee both have qualifications that, in the judgment of the Company, are relatively equal, the AT&T Mobility bargained employee will be selected for the vacancy.   This Agreement does not modify or diminish the current **2017** Mobility Labor Agreement language regarding Article 13 – Work Assignments.

### 3.  Clarification for AT&T Mobility Bargained Employees Leaving the Mobility Unit

Paragraphs 5 and 6 of the CSE Section of the NTP set forth specific circumstances in which a CWA represented regular employee covered by a CWA Labor Agreement may receive a Relocation Allowance per the applicable terms and conditions of the collective bargaining agreement at his/her former Company. The **2017** Mobility Labor Agreement which affords management discretion to afford such allowances will govern AT&T Mobility Bargained Employees who leave the Mobility Unit.

### 4. Additional Agreement Terms

The Union agrees that it will not seek to alter any existing bargaining units in any AT&T Company on the basis of any movement or transfer of employees as a result of this Agreement. Further, the Union will not, on the basis of this Agreement or change in operations, practices or benefits administration, eligibility or entitlement made by AT&T Mobility and/or the Participating Companies as a result of this Agreement, in any pleading, petition, complaint or proceeding before the National Labor Relations Board, an arbitrator or panel of arbitrators, or any court, assert, claim, charge or allege that such companies are a single or joint employer or enterprise, alter egos, accretions or successors of one another, or that any bargaining units of said entities represented by or sought to be represented by the Union are a single bargaining unit, or are or should be otherwise altered in their scope or composition. This commitment on the part of the Union will survive the expiration of this Agreement, unless and until such time as this commitment is terminated by the mutual written Agreement of the parties.

Notwithstanding any other provision to the contrary, this Agreement and any actions under it are not subject to arbitration.

This Agreement will become effective for each group of represented employees upon ratification of the affected employees' Covered CBA, upon being administratively feasible to implement for that group, and upon the signature of the appropriate CWA Representative authorized for the Mobility CBA. If one of the Covered CBAs fails to ratify, this Agreement will not become effective for the employees under that Covered CBA. Once effective for the Covered CBAs that ratify, this Agreement will remain in effect up to and including **February 12, 2021**.

The CWA represents and acknowledges that it is authorized under its International Constitution to execute this Agreement without a ratification vote of the Mobility Unit.

Sincerely,                                                                                    Agreed and Accepted by:

Brian Cattaneo                                                                          Patricia Telesco
Lead Labor Relation Manager                                              Area Director, CWA District 1
AT&T                                                                                         Communications Workers of America

**Attachment A to the Terms of Transfer Applicable to Employees Transferring between the Attached AT&T Participating Companies and AT&T Mobility Services LLC  and AT&T Customer Services, Inc. into and out of the Mobility Bargaining Unit Represented by the Communication Workers of America Districts 1, 2-13, 4, 7, and 9**

Ameritech Services, Inc.

AT&T Billing Southeast, LLC

AT&T Corp.

**AT&T Customer Services, Inc.**

**AT&T Mobility Puerto Rico Inc.**

AT&T Mobility **Services** LLC

AT&T Services, Inc.

**AT&T of the Virgin Islands, Inc.**

BellSouth Communication Systems, LLC

BellSouth Telecommunications, LLC

Illinois Bell Telephone Company

Indiana Bell Telephone Company**, Incorporated**

Michigan Bell Telephone Company

Nevada Bell Telephone Company

The Ohio Bell Telephone Company

Pacific Bell Telephone Company

SBC Global Services, Inc.  (Midwest, West Region)

Southwestern Bell Telephone Company

Wisconsin Bell **Inc.**